Gordon **REEVES**, d/b/a Gordon Reeves Chevron Station, and Edward McCullough, Plaintiffs-Appellees,

v.

William E. **SIMON**, Director, Federal Energy Office, and Donald C. Alexander, Commissioner of Internal Revenue, Defendants-Appellants.

No. 9–18.

Temporary Emergency Court of Appeals.

Nov. 27, 1974.

Certiorari Denied March 24, 1975.
See 95 S.Ct. 1426.

Allen W. Hausman, Dept. of Justice, Washington, D.C. (Carla A. Hills, Asst. Atty. Gen., New York City, and Stanley D. Rose, Dept. of Justice, Washington, D. C., with him on the brief), for defendants-appellants.

Michael J. Meehan, Robertson, Molloy, Ficket & Jones, Tucson, Ariz., for plaintiffs-appellees.

Before CARTER, HASTIE and CHRISTENSEN, Judges.

CARTER, Judge.

This is an appeal from the order of the United States District Court for the District of Arizona, enjoining the Federal Energy Office (FEO) from enforcing certain of its regulations with respect to retail fuel allocation, and denying the FEO's motion for summary judgment against plaintiff-appellee, Gordon Reeves. The district court held that 10 C.F.R. Chapter II, Part 210, Subsection 210.62(b) of the Mandatory Petroleum Price & Allocation Regulations, which prohibited retail gasoline service stations from limiting sales of all or part of their monthly gasoline allocation to their regular customers to the exclusion of other motorists, was invalid, arbitrary, discriminatory and without a rational basis, and its adoption invalid for failure to comply with Administrative Procedure Act (hereafter APA) and Emergency Petroleum Allocation Act (hereafter EPAA) procedural requirements. The FEO disputes the validity of this holding in all respects. We reverse.

### FACTS

Gordon Reeves is sole proprietor of an independent Chevron-branded retail service station located on the main thoroughfare of a residential neighborhood in Tucson, Arizona. His primary source of income is derived from the sale of gasoline and the provision of repair services and accessory sales.

The October, 1973, embargo of crude oil and petroleum products by the Arab nations produced shortages of all petroleum products, including gasoline. When gasoline supplies began to get short, Reeves experienced severe difficulties, with two primary results: 1)

long lines of customers (many making very small quantity purchases) forced him and his employees to spend virtually full time during most of the day at the gas pumps, thereby neglecting service work. Accessory sales and repair service thus were greatly diminished due to the long delays; 2) the long delays and lengthy lines for gasoline sales so disrupted operations that normal and long-standing customer relationships were jeopardized.

To combat the situation, Reeves divided his daily gasoline supply in half, conducting "open sale" to any member of the general public in the morning and, when one-half of the gasoline had been used, making the remaining half available to established customers in the afternoon.

In January and February of 1974 the long lines at service stations caused many other service station owners to curtail the days and hours of gasoline sales and impose restrictions on the amount of gasoline sold to individual motorists, causing instances of violence and the inability of many non-"regular" customers to obtain any gasoline at all. In response to this virtual crisis situation, the FEO added subsection (b) to § 210.62.[1] This subsection provided:

"(b) No supplier shall engage in any form of discrimination among purchasers of any allocated product. For purposes of this paragraph discrimination means extending any preference or sales treatment which has the effect of frustrating or impairing the objective, purposes and intent of the chapter or of the Act, and includes but is not limited to refusal by a retail marketer of motor gasoline or diesel fuel to furnish or sell an allocated product *due to the absence of a prior selling relationship with the purchaser* or establishment of a new

---

1. Section 210.62, as originally promulgated, provided in pertinent part:
 "Suppliers will deal with purchasers according to normal business practices. . . . [N]o supplier may require or impose discriminatively more stringent credit

terms or payment schedules on purchasers than the normal business practice of the supplier, nor may any supplier modify any other normal business practice so as to result in circumvention of any provision of this chapter."

volume purchase arrangement where customers of retailers agree in advance to purchase in excess of normal amounts . . . and thereby receive preferential treatment." (Emphasis added)

The subsection was made effective immediately and was not sent to the Attorney General or the FTC for comment as to its possible anti-competitive effect.

## I

## COMPLIANCE WITH § 553(d) OF THE ADMINISTRATIVE PROCEDURE ACT

Section 553(d) of the APA, 5 U.S.C. § 553(d), provides in pertinent part:

"The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except . . .

(2) interpretative rules and statements of policy; or

(3) as otherwise provided by the agency for good cause found and published with the rule."

Reeves contends that the amendment to § 210.62 was a substantive change in the law and was not merely "interpretative." Further, he contends that the FEO based its failure to give 30-day notice on § 553(d)(2) of the APA and therefore cannot now justify its action on the good cause exception of § 553(d)(3). We reject both contentions.

 In promulgating § 210.62(b), the FEO indicated its decision to dispense with the 30-day notice period with the following language:

"This amendment is issued today in an effort to end the growing practice of sellers providing preferential treatment to customers on the basis of longstanding relationships or for any other reason. *The FEO has noted a serious alteration in established business practices*—particularly with respect to gasoline and diesel fuel retail

sales—which result in certain purchasers being served, while other are wholly excluded.

"The amendment to § 210.62 concerning 'normal business practices' is addressed to this situation as well as to other preferential sales devices. Sellers whose normal business practice has been to serve the public may not modify that practice to sell only to 'regular customers' or otherwise discriminate among purchasers of an allocated product. . . .

"Because the purpose of these amendments is to provide immediate guidance and information with respect to the mandatory petroleum allocation and price regulations, the Federal Energy Office finds that normal rulemaking procedure is impracticable and that good cause exists for making these amendments effective in less than 30 days." (Emphasis added).

The FEO thus believed that the amendment was necessary to combat "a serious alteration in established business practices," in violation of original § 210.62. The new subsection (b) could properly be seen to be "interpretative" of what was meant by "normal business practices." In that case, there would have been no need for the FEO to explain its decision to dispense with the 30-day notice requirement. Clearly, then, by indicating that normal rulemaking procedures were "impracticable" and that "good cause exists" due to the need for "immediate guidance", the FEO intended from the outset to comply with the provisions of § 553(b)(B) [2] and (d)(3) (good cause).

 We are satisfied that there was in fact "good cause" to find that 30-day notice was "impracticable, unnecessary, or contrary to the public interest" within the meaning of § 553(b)(B). Like DeRieux, et al. v. Five Smiths, Inc., Em.App., 499 F.2d 1321 (1974), cert. denied, sub nom. Five Smiths, Inc. v.

---

2. Section 553(b)(B) provides that normal rulemaking procedures do not apply
"when the agency for good cause finds (and incorporates the finding and a brief

statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."

Holloway, —— U.S. ——, 95 S.Ct. 176, 41 L.Ed.2d 141. (1974), "[t]his conclusion is based upon facts so obvious that they may be judicially noticed." *Id.* at 1332. The gasoline shortage was a temporary, but highly disruptive, national emergency. The long lines and violence required immediate action. Some purchasers were being served, while others were totally excluded. Under these circumstances, we find that the promulgation of § 210.62(b), with accompanying statement of good cause for dispensing with the 30-day notice requirement, was in conformance with the APA.

## II

### COMPLIANCE WITH § 6(c)(3) OF THE EMERGENCY PETROLEUM ALLOCATION ACT

In Section 4(a) of the Emergency Petroleum Allocation Act of 1973, Congress directed the President to exercise the authority delegated to him by the Act by issuing "a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in amounts specified in . . . and at prices specified in . . . such regulation." A precise timetable and specific procedures were established, including, in § 6(c)(3), that:

> "The regulation promulgated under section 4(a) of this Act shall be forwarded on or before the date of its promulgation to the Attorney General and to the Federal Trade Commission, who shall, at least seven days prior to the effective date of such regulation, report to the President with respect to whether such regulation would tend to create or maintain anticompetitive practices or situations inconsistent with the antitrust laws, and propose any alternative which would avoid or overcome such effects while achieving the purposes of this Act."

In issuing the initial allocation and price regulation, the FEO duly complied with each of the foregoing requirements. Reeves, however, contends that the FEO was also required to submit all substantive amendments to the Attorney General and the FTC, and that § 210.62(b), having not been so forwarded, was thereby invalid. We disagree.

■ The detailed and specific manner for issuing the allocation and price regulation contained in the EPAA cannot reasonably be interpreted to apply to any FEO action but the initial promulgation of the § 4(a) mandated regulation. After the initial promulgation, the established rulemaking procedures of the APA were to control. This is made evident by the incorporation in § 5(a)(1) of the EPAA of §§ 205 through 211 of the Economic Stabilization Act. Section 207 of that Act makes the rulemaking provisions of § 553 of the APA applicable to the FEO.

This interpretation of § 6(c)(3) is also supported by the legislative history of the EPAA. The House Report, U.S. Code Cong. & Admin.News 1973, pp. 2582, 2599, 2600, in a section-by-section analysis of the Act, interprets § 6(c)(3) to require reports from the Attorney General and the FTC on the "promulgation" of "*the* regulation" a week before "the effective date of such regulation." By contrast, § 7(a) is described as requiring the FTC "during the forty-five day period *beginning on the effective date of the regulation first promulgated under section 4,* to monitor the program established under such regulation; and not later than *sixty days after such effective date to report . . . respecting the effectiveness of the bill and actions taken pursuant thereto.*" (Emphasis added).

The two-step process envisioned, then, was initial submission of the program to the Attorney General and the FTC, with subsequent review of the bill and actions "taken pursuant thereto" without submission of each action on a piecemeal basis. In light of the emergency nature of the authority delegated to the FEO and the difficulty of its duty to establish complex but fair procedures within a short time, a requirement that it submit any and every amendment to the Attorney General and the FTC would be counterproductive. We do not believe

that the Act itself or the legislative history thereof establish such a requirement.

## III

### SECTION 210.62(b) WAS NEITHER ARBITRARY NOR DISCRIMINATORY AND HAD A RATIONAL BASIS

Section 2(b) of the EPAA provides:

"The purpose of this Act is to grant to the President . . . specific temporary authority to deal with shortages of crude oil, residual fuel oil, and refined petroleum products or dislocations in their national distribution system. The authority granted under this Act shall be exercised for the purpose of minimizing the adverse impacts of such shortages or dislocations on the American people and the domestic economy."

Among the objectives to be accomplished "to the maximum extent practicable" are:

"Sec. 4(b)(1)

(D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers;

\* \* \* \* \* \*

(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent marketers, branded independent marketers, and among all users;

\* \* \* \* \* \*

(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms."

■■■ Reeves contends, and the district court so held, that the effect of § 210.-62(b) was to destroy the competitive viability of branded independent retailers by forcing them to supervise a rationing system, with adverse impact upon the repair service and accessory sales portions of their businesses. This contention misconceives the burden and the duty of the FEO in attempting to effectuate the mandate of the EPAA. It would have been an impossibility to achieve *all* of the objectives in § 4(b)(1), *supra*. Priorities had to be established. The FEO attempted to minimize the adverse impacts of the shortages on the American people, and to ensure an "equitable distribution of . . . refined petroleum products . . . among all users." It *did not* establish a rationing system, but instead merely forbade alteration of normal business practices so as to give preference to "regular" customers. The fact that Reeves suffered a loss of service and accessory income for a portion of one month does not invalidate the choice made by the FEO.

This court has recognized a strong presumption in favor of administrative decisions by those agencies charged with immediate administration of a new federal statute. *See* University of Southern California v. Cost of Living Council, 472 F.2d 1065, 1068–1069 (Em.App. 1972); Pacific Coast Meat Job. Ass'n v. Cost of Living Council, 481 F.2d 1388, 1391–1392 (Em.App.1973); Mandel v. Simon, 493 F.2d 1239, 1240 (Em.App. 1974). In *Mandel, supra,* the court stated: "The Federal Energy Office must have great flexibility during the formative period of regulation. Judicial interference at this time may delay rather than advance effective regulation of this area." *Id.* at 1240. *See also* Note, Phase V: The Cost of Living Council Reconsidered, 62 Geo.L.J. 1663, 1669–1673 (1974).

In issuing § 210.62(b), the FEO was attempting to minimize the impact of the shortage by spreading what gasoline

there was to as many people as possible, and to prevent discrimination against non-regular customers. A first-come, first-served policy (except for those performing essential functions, *i. e.,* doctors, policemen, etc.), was no more inequitable than any other solution and has been approved in another context by the Supreme Court. *See* L. P. Steuart & Bro. v. Bowles, 322 U.S. 398, 404–406, 64 S.Ct. 1097, 88 L.Ed. 1350 (1944).

Although the FEO *could have* provided for preferential treatment for identifiable *commercial* customers, or for a half and half system like that established by Reeves, the administrative problems in identifying "regular" customers at the retail level would have been immense. Most retailers would have been basing their preferential treatment on affidavits and non-reviewable standards. The possibility of unjustified discrimination would have been great. Whether or not plans could have been devised which would better effectuate the objectives of the EPAA, we cannot say that the plan chosen, and § 210.-62(b) in particular, was without a rational basis.

We reverse and remand for entry of summary judgment against the plaintiff-appellee.