PASCO, INC., Plaintiff-Appellee,

v.

FEDERAL ENERGY ADMINISTRATION, an agency of the United States, and Frank G. Zarb, Administrator, Federal Energy Administration, Defendants-Appellants.

No. 10–7.

Temporary Emergency Court of Appeals.

Oct. 14, 1975.

Marvin Coan, with whom Rex E. Lee, Asst. Atty. Gen., and Stanley D. Rose, Atty., Dept. of Justice, Washington, D. C., were on the brief for appellants.

David Ginsburg, Washington, D. C., with whom Fred W. Drogula and Peter H. Rodgers, Ginsburg, Feldman & Bress, Washington, D. C., and Arlo W. Mayne, Ashland, Ky., were on the brief for the amicus curiae, Ashland Oil, Inc.

Jerry L. Shulman and Joseph Califano, Jr., Williams, Connally & Califano, Washington, D. C., Jack Speight, Hanes, Carmichael, Gage & Speight, Cheyenne, Wyo., on the brief for appellee.

Before CARTER, CHRISTENSEN and ESTES, Judges.

ESTES, Judge.

The plaintiff-appellee, Pasco, Inc., sought and obtained, in the district court, injunctive relief from enforcement of the defendants-appellants', Federal Energy Administration, et al. (FEA), Old Oil Entitlements Program, 10 C.F.R. § 211.67 (Entitlements program), 39 F.R. 42,246 (December 4, 1974), and a declaratory judgment that the Entitlements program is invalid as applied to Pasco, on the grounds that: the Entitlements program fails to exempt from entitlement purchase obligations all small refiners as defined in section 3(4) of the Emergency Petroleum Allocation Act of 1973, Pub.L. No. 93–159, 87 Stat. 628, 15 U.S.C. § 751 et seq. (1975 Supp.) (Allocation Act),[1] and similarly fails to exempt those small refiners established pursuant to federal antitrust decrees,[2] such failures being contrary to Congressional intent in passing the Allocation Act; the Entitlements program is arbitrary and capricious and beyond the FEA's authority, because no differentiation is made, among entitlement sellers, between those

---

1. The term "small refiner" as used in this opinion shall mean a small refiner as defined under the Allocation Act, i. e., "a refiner whose total refinery capacity . . . does not exceed 175,000 barrels per day." 15 U.S.C. § 752(4) (1975 Supp.).

2. Only two companies, Pasco, Inc. and Navajo Refining Company, exist as small refiners which were created following antitrust divestiture decrees.

refiners running a high proportion of new, released, or stripper well oil which they produced and refiners running a high proportion of such uncontrolled oil which they purchased in the open market; the administrative modification and review of Pasco's exception application was arbitrary, capricious, and contrary to substantial evidence; and the administrative appeal process from FEA exception decisions violated the publication requirements of the Freedom of Information Act, 5 U.S.C. § 552(a)(1).

This expedited appeal is from the August 27, 1975 decision and final judgment of the United States District Court for the District of Wyoming, Cheyenne Division, which granted Pasco complete and permanent relief from its obligations, past and future, under the Entitle-

ments program, and ordered such additional requested relief necessary for the FEA to administratively comply with the court order on an equitable basis *vis a vis* other participants in the program.[3] The district court judgment also dismissed the counterclaim of the United States, which was seeking not only to enforce the Entitlements program as applied to Pasco, but also seeking damages for Pasco's past violations of the FEA entitlement regulation.[4]

This court has jurisdiction of FEA's appeal under section 211 of the Economic Stabilization Act of 1970, Pub.L.No. 91–379, 84 Stat. 799, as amended (Stabilization Act), 12 U.S.C. § 1904 note (1975 Supp.), as incorporated into the Allocation Act by section 5(a)(1) thereof, 15 U.S.C. § 754(a)(1) (1975 Supp.).[5]

---

3. Upon Findings of Fact and Conclusions of Law filed therewith, the district court issued an injunction which declared all entitlement obligations imposed on Pasco to be invalid and permanently enjoined the FEA from requiring Pasco's compliance with any past or present entitlement purchase obligations and from imposing any future entitlement purchase obligations on Pasco under the Entitlements program. The district court further ordered the FEA to a) issue to Pasco sufficient entitlements, which Pasco could sell, to enable it to recover the full amount previously expended under the Entitlements program, and b) issue sufficient entitlements to other refiners, which they could sell, to enable them to recover monies for further entitlement purchase obligations of Pasco which it refused to meet and which, under the district court order, were declared invalid. On September 5, 1975, the defendants' motion for a stay of the district court order pending appeal was granted by this court.

4. Under Special Rule No. 3, 2 CCH Energy Management ¶ 13,655A, 39 F.R. 43,814 (Dec. 19, 1974), Pasco was totally exempt from the Entitlements program in November, 1974, since its refinery run levels averaged less than 30,000 barrels per day during the month. Therefore, Pasco had no purchase obligations on the January, 1975 entitlements list issued by the FEA. Due to the administrative complexities of computing each refiner's entitlements obligation, there is a two-month lag between the refinery runs and the month in which entitlements must be purchased based on those runs. Thus, for refinery runs made by Pasco during December, 1974, its total en-

titlements purchase obligation was $465,955, which was paid by Pasco in February under protest. Pasco did not make any further payments under the Entitlements program, even though its obligations for runs during the months of January, February, and March were, respectively: $1,205,328; $1,035,571.50; and $1,810,840.51, for total unpaid obligations of $4,051,740.01 for the months of March, April and May.

5. Throughout the pendency of this appeal, this court has had jurisdiction by reason of section 4(g)(1) of the Allocation Act, 15 U.S.C. § 753(g)(1) (1975 Supp.). Since the Allocation Act, as extended under the terms of the Emergency Petroleum Allocation Act—Extension, Pub.L.No.93–511, 88 Stat. 1608, expired of its own time limitations at midnight, August 31, 1975, only appeals within the saving clause of the Allocation Act, section 4(g)(1), 15 U.S.C. § 753(g)(1) (1975 Supp.), or the general saving clause, 1 U.S.C. § 109, would have been within our limited jurisdiction on September 5, 1975, when this notice of appeal was timely filed. This appeal comes within the Allocation Act's saving clause, since it provides that "enforcement" actions, civil or criminal, pending on the Act's expiration or based upon acts committed prior to such expiration constitute justiciable controversies which this court may review. The saving provision of the Allocation Act, section 4(g)(1), 15 U.S.C. § 753(g)(1) (1975 Supp.), is identical to the saving provision, section 218, of the Economic Stabilization Act of 1970, Pub.L.No.91–379, 84 Stat. 799, as amended (Stabilization Act), 12 U.S.C. § 1904 note (1975 Supp.), which this court carefully considered following the Stabilization

Pasco's attack on the Entitlements regulation itself, 10 CFR § 211.67, is basically three-fold. It is contended that, contrary to Congressional intent, the FEA failed to specifically and totally exempt from all entitlement purchase obligations, first, all small refiners as defined under the Act and, second, all small refiners established pursuant to an antitrust decree. In addition, Pasco contends and the District Court held that the entire Entitlements program is arbitrary, capricious, and beyond the agency's authority, for the reason that no differentiation is made between producer-refiners and purchaser-refiners; that is, the regulation does not distinguish, in providing for the issuance of entitlements, between those refiners running low proportions of old oil due to their own high production of new, released, and stripper well oil and those refiners running low proportions of old oil due to their purchases of such new, released, and stripper well oil on the open market.

The Allocation Act was enacted by Congress to authorize the President to deal with the present or threatened severe economic hardships caused by shortages of imported and domestically produced crude oil, all of which constituted a "national energy crisis" and a threat to the public health, safety, and welfare. It was the express intent of Congress that the President be granted "full flexibility in devising the most effective and efficient means of meeting the priority needs of the American people identified in section 4(b)." H.R.Conf.Rep.No.93–

628, U.S.Code Cong. & Ad.News, 93d Cong., 1st Sess., pp. 2688, 2689 (1973).

In reviewing the exercise of that authority, it must be remembered that the "[e]xercising of the administrative authority and the accomplishment of purposes enumerated by Congress under the recognized emergency conditions are exceedingly complicated undertakings." *Condor Operating Company v. Sawhill,* 514 F.2d 351, 359 (Em.App.1975), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975). The broad mandate for the equitable allocation of crude oil at equitable prices combined with the rapid rise in world oil prices left the FEA with a "gargantuan task."[6] As stated in *Condor Operating Company v. Sawhill, supra,* at p. 359:

> The urgency of the challenge confronting the agency upon the passage of the Emergency Petroleum Allocation Act already has been recognized. *Reeves v. Simon,* 507 F.2d 455 (Em. App.1974); *People of State of California, State Lands Com'n v. Simon,* 504 F.2d 430 (Em.App.1974); *Mandel v. Simon,* 493 F.2d 1239 (Em.App.1974).

To minimize the inflationary impact of world-wide oil prices and at the same time to provide an incentive for increased domestic production of crude oil, the "two-tier" pricing system for crude oil was promulgated.[7] The "two-tier" pricing system basically imposes a ceiling price of approximately $5.25 per barrel on all "old" oil and allows new and released oil to be sold without respect to

Act's expiration. See *United States v. State of California,* 504 F.2d 750 (Em.App.1974), *cert. denied,* 421 U.S. 1015, 95 S.Ct. 2423, 44 L.Ed.2d 684 (1975). Accord, *State Trial Attorneys Association, et al. v. Houston I. Flournoy, et al.,* 522 F.2d 1406 (Em.App.1975); *Carpenters 46 County Conference Board, et al. v. The Construction Industry Stabilization Committee,* 522 F.2d 637 (Em.App.1975).

6. This phrase was similarly applied to the burden imposed on the Cost of Living Council under the Stabilization Act which, like the Allocation Act, was an extremely broad delegation of authority by Congress to the Executive Branch under recognized emergency conditions. *University of Southern Cal. v. Cost of*

*Living Council,* 472 F.2d 1065, 1068 (Em.App. 1972).

7. The Cost of Living Council originated the "two-tier" pricing system for crude oil as a part of Phase IV of the Stabilization Program. 6 C.F.R. § 150, Subpart L, 38 F.R. 22,536 (Aug. 22, 1973). These rules were subsequently adopted by the Federal Energy Office as 10 CFR § 212, Subpart D, 39 F.R. 1924 (Jan. 15, 1974). The Federal Energy Office became the Federal Energy Administration on June 27, 1974, pursuant to the Federal Energy Administration Act of 1974, Pub.L. 93–275, 88 Stat. 97, 15 U.S.C. § 761 et seq. (1975 Supp.)

the ceiling price, i. e., at approximately $11.28 per barrel.[8] The FEA found, however, that while the "two-tier" system met certain necessary objectives, the great disparity between the price of controlled and uncontrolled crude oil was having an unequal impact on all refiners. During the base period of May, 1973, composite crude oil costs of all refiners were approximately equal; however, with the pricing system in effect, the major integrated oil companies, who as a class had far greater access to old oil, had significantly lower composite crude oil costs in refining their products than did the small and independent refiners.

To insure that all refiners and marketers shared equally in the benefits of price-controlled crude oil and the burdens of uncontrolled crude oil, the FEA adopted the Entitlements program. Under this program, a refiner must have one "entitlement" for each barrel of old oil it refines during a particular month. All refiners are initially issued for each month an amount of entitlements equal to their proportionate share of the old oil refined during the month on a nationwide basis. Thus, a refiner running more old oil as a percentage of its total refinery runs than the national average would have to buy additional entitlements from a refiner which ran a smaller percentage of old oil during the month than the national average. The national ratio of old oil runs to total refinery runs is lowered somewhat by the issuance of additional entitlements to small refiners under the "small refiner bias" built into the regulation[9] and to certain eligible firms which import residual fuel oil and home heating oil. By requiring refiners and importers who sell entitlements to reduce their crude oil or product costs by the amount of the entitlement sales proceeds, and allowing a purchaser of entitlements to include the cost of entitlements in its crude oil costs, the FEA basically equalized the average weighted crude oil costs of all refiners, thereby eliminating the inequities caused by the "two-tier" pricing system.[10]

---

**8.** The first sale of crude oil produced from any lease whose average daily production of crude oil for the preceding calendar year does not exceed 10 barrels per well (a stripper well) is also at an uncontrolled price by reason of section 4(e)(2)(A) of the Allocation Act, 15 U.S.C. § 753(e)(2)(A) (1975 Supp.), which specifically exempts such oil from regulation under section 4(a) of the Allocation Act. Basically, under the "two-tier" pricing system, a base production control level for each property was established, based on 1972 monthly production levels. The amount by which the total number of barrels of oil produced and sold from the property exceeds the base production control level for that month and any current cumulative deficiency in the base production control level, constitutes "new" oil (10 CFR § 212.72) which may be sold without respect to the ceiling price of oil (10 CFR § 212.73) under 10 CFR § 212.74. For any month in which the production and sale of oil has been less than the base production control level, since the first month in which new oil was produced and sold, there exists a current cumulative deficiency (10 CFR § 212.72) which may increase by subsequent monthly production below the base production control level or may decrease by subsequent production of what would otherwise be classified as new oil. "Released" oil, which may also be sold without respect to the ceiling price, is that part of the base production control level for any month which is equal to the new oil produced and sold during that month. (10 CFR § 212.72). "Old" oil then represents the total barrels of oil produced and sold from a property during a specific month, less the number of barrels of that oil classified as new and released. (10 CFR § 212.72). The old oil must be sold in accordance with the ceiling price rule of 10 CFR § 212.73. For a comprehensive discussion of the validity and effects of the "two-tier" pricing system, see *Consumers Union v. Sawhill*, 525 F.2d 1068, rehearing en banc (Em.App.1975), vacating 512 F.2d 1112 (Em.App.1975).

**9.** 10 CFR § 211.67(e). The phrase "small refiner bias" was used in FEA's published notices of rulemaking. 39 F.R. 39,740 (Nov. 11, 1974); 39 F.R. 42,246 (Dec. 4, 1974).

**10.** In *Marathon Oil Company v. F. E. A., et al.,* (CA No. 75–36, N.D.Ohio, Jan. 31, 1975), 3 CCH Energy Management ¶ 26,015, the court stated, at p. 26,152:

The mere fact that three major integrated refiners which have less than their proportionate share of old oil will be entitlement sellers, while a few small refiners will be buyers, does not make the program irrational. Rather, the program merely places the entire petroleum industry in the competitive

The small refiners, as a class, were by no means overlooked in the promulgation of the Entitlements program. The notice of proposed rulemaking published by the FEA, setting forth the tentative form of the Entitlements regulation, contained a small refiner bias which was subsequently increased and adopted as a part of the final rule.[11] In addition to the number of entitlements a small refiner would otherwise receive for a particular month under the program, the small refiner bias provides additional entitlements to small refiners for each day of that month in an amount equal to a designated percentage of its average daily volume of crude oil runs to stills, with the percentage basis becoming greater as crude oil runs to stills become smaller. Further, an emergency amendment to the entitlements regulation, Special Rule No. 3, was issued by the FEA to provide small refiners with special relief in the form of a graduated phase-in of the program.[12]

The FEA recognized that immediate imposition of the full entitlement pur-

chase requirements of the program could have a severe short-term economic impact on certain small refiners with a high proportion of old oil in their crude oil runs to stills as compared with the national old oil ratio, and that a special rule which would allow these refiners time to arrange any necessary financing or restructuring of their marketing operations was necessary. For the same reasons, the first phase of Special Rule No. 3 was subsequently extended to runs in December, 1974, and, in addition, any refiner filing an exception application on or prior to February 21, 1975 received an automatic extension of the first phrase exemption until the application was passed on by the FEA.[13]

Pasco, a small, partially integrated refiner, contends, however, that such special provisions failed to effectuate the intent of Congress. Relying on section 4(b)(1)(D) and 4(c)(3) of the Allocation Act as expressions of specific Congressional intent, the district court held the FEA erred in promulgating the Entitlements program without a complete ex-

situation that existed prior to the two-tier pricing system.
To the same effect, see *Cities Service, et al. v. F. E. A.,* (CA No. 75–653, D.D.C., July 10, 1975), 3 CCH Energy Management ¶ 26,024 at p. 26,223; *Gulf Oil Corporation v. F. E. A.,* 391 F.Supp. 856 (W.D.Pa., 1975), 3 CCH Energy Management ¶ 26,014; and *Exxon Oil Company v. F. E. A.,* (C.A.No. 75–150, D.N.J., Jan. 30, 1975).

11. The Entitlements program originated in a notice of proposed rulemaking issued by the FEA on August 28, 1974, which proposed the allocation of old oil being refined in the United States proportionately among all refiners. 39 F.R. 31,650 (Aug. 30, 1974). Following the receipt of more than 600 comments from interested persons, including Pasco, and a public hearing held on September 24 and 25, 1974, the FEA issued another notice of proposed rulemaking on November 7, 1974, setting forth its tentative conclusions as to the final form the proposed rule should take, and including, in response to comments by small refiners, the small refiner bias. 39 F.R. 39,740 (November 11, 1974). The FEA received over 175 more comments on its November 7 notice and subsequently adopted, on November 29, 1974, the "Old Oil Entitlements Program" with certain changes which included an increase in the

amount of the small refiner bias. 39 F.R. 42,-246 (Dec. 4, 1974).

12. Special Rule No. 3, in its first phase, essentially provided that for the first 30,000 barrels of crude oil run by a small refiner per day, no purchases of entitlements would be required for runs during the month of November, 1974. For runs during the months of December, 1974, and January, 1975, the rule, in its second and third phases, provided that the small refiner, as to the first 30,000 barrels of crude oil run per day, would have to purchase only one-third and two-thirds, respectively, of the entitlements for which it would otherwise be responsible. 39 F.R. 43,814 (Dec. 19, 1974).

13. 40 F.R. 6197 (Feb. 10, 1975). Thus, for refinery runs in December, the first 30,000 barrels of crude oil run per day by a small refiner were exempt as to entitlement purchase obligations. For the first 30,000 barrels of January, 1975 crude oil runs per day, instead of purchasing two-thirds of its entitlement obligations, as originally provided, a small refiner was obligated for only one-third of its entitlements obligation; and for the first 30,000 barrels of February, 1975 crude oil runs per day, a small refiner was obligated for only two-thirds of its entitlements obligation.

emption for all small refiners. Section 4(c)(3) requires such adjustments on the part of the Executive in the allocations of crude oil as are necessary to implement the objectives of section 4(b), and section 4(b)(1)(D) established the goal of providing for the

preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers; . . .

While meeting the mandates of section 4(b)(1)(D), however, the FEA at the same time had to consider the other eight objectives of section 4(b)(1), including section 4(b)(1)(F), mandating the "equitable distribution of crude oil, . . . at equitable prices among *all* . . . sectors of the petroleum indus-

try, including . . . small refiners . . . ." [14] The order of the objectives was not intended to establish any priority, nor was it believed that the objectives were all mutually attainable. [15] This court has previously recognized that none of the nine objectives of the Act should be elevated to the level of a mandatory duty and that "the balancing of all objectives is required 'to effectuate maximum achievement of their competing interests.'" *Air Transport Association of America, Trans World Airlines, Inc. v. F. E. O., et al.,* 520 F.2d 1339 (Em.App.1975); *Consumers Union v. Sawhill,* 525 F.2d 1068, rehearing en banc (Em.App.1975), vacating 512 F.2d 1112 (Em.App.1975).

Under the existing program, small refiners are responsible for approximately 25 per cent of all entitlement purchase obligations. Upon a showing by a refiner in an exception application filed pursuant to 10 CFR § 205, Subpart D, of "serious hardship or gross inequity" (10 CFR § 205.50), under the Entitlements

14. In addition to the objectives of subsection (D) and (F) of section 4(b)(1) of the Allocation Act, Congress also indicated that the regulation allocating crude oil under the mandate of section 4(a) should provide "to the maximum extent practicable," for:

(A) protection of public health, safety, and welfare (including maintenance of residential heating, such as individual homes, apartments, and similar occupied dwelling units), and the national defense;

(B) maintenance of all public services (including facilities and services provided by municipally, cooperatively, or investor owned utilities or by any State or local government or authority, and including transportation facilities and services which serve the public at large);

(C) maintenance of agricultural operations, including farming, ranching, dairy, and fishing activities, and services directly related thereto;

\* \* \* \* \* \*

(E) the allocation of suitable types, grades, and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity;

\* \* \* \* \* \*

(G) allocation of residual fuel oil and refined petroleum products in such amounts and in such manner as may be necessary for

the maintenance of exploration for, and production or extraction of, fuels, and for required transportation related thereto;

(H) economic efficiency; and

(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

15. The Conference Committee stated in its report:

The listing of objectives in successive paragraphs (A) through (I) in section 4(b)(1) is not intended to establish any order of priority. There [sic] are collective goals, and the conferees have not attempted to discern an order of precedence or value one against another. It is fully recognized that, in some instances, it may be impossible to satisfy one objective without sacrificing the accomplishment of another.

H.R.Conf.Rep.No.93–628, U.S.Code Cong. & Ad.News, 93d Cong., 1st Sess. p. 2688 (1973). As the district court stated in *Union Oil Company of Calif. v. F. E. A.,* (C.V. 74–1943–MML, C.D.Ca., July 25, 1974), 3 CCH Energy Management ¶ 26,007, at p. 26,098, the "goals [of the Allocation Act] are inherently inconsistent, and no regulation could promote all of them at the same time . . . . A balancing of goals is required, and Congress has left the details of this balancing to the Federal Energy Administration."

program, the FEA can grant specific relief tailored to the individual refiner through the expedited exception process established with the Entitlements program. Indeed, Pasco has received both partial and total relief from its entitlement purchase obligations for the first three quarters of 1975.[16]

The above considerations apply with equal force to the contention of Pasco that small refiners created by antitrust decrees were intended by Congress to be specifically exempt from the entitlements program. Pasco entered the petroleum industry on January 1, 1973, following its purchase of certain properties which were sold pursuant to a 1970 antitrust consent divestiture decree, to effectuate a merger between Sinclair Oil Company and Atlantic Richfield Corporation. *United States v. Atlantic Richfield Company,* 297 F.Supp. 1061 (S.D.N. Y.1969).

The district court, in citing the Congressional Conference Committee Report on the Allocation Act in support of its finding that the FEA erred in failing to exempt Pasco as a refiner established under an antitrust decree, fatally omitted the following underlined language which completed the committee comments on this issue. The Committee Report states:

The conferees wish to comment specifically on the application of this section in circumstances where a successor company has acquired assets and made capital investments in reliance on a court decree issued in furtherance of a resolution of antitrust claims. As noted in an earlier portion of this report, it is intended that the allocation program minimize economic distortion and interference with market mechanisms. Also this legislation lists as a basic objective the need to promote and foster competition in the petroleum industry. It would be an anomalous result if the allocation program would be implemented in a manner which would frustrate or make impossible the accomplishment of a court-ordered decree whose objective was to create a viable competitive entity where there was none before. It is expected, therefore, that the President will take care to assure that the allocation program would not interrupt supply agreements, whose very terms had been ordered by a court to assure that an entity would be able to operate in a manner which offers meaningful competition. <u>The Committee does not wish, however, to totally insulate such supply agreements. It is fully intended and expected that the President would have authority to abrogate such contracts if the President finds that he must do so in order to accomplish the objectives of this Act.</u>

H.R.Conf.Rep.No.93–628, U.S.Code Cong. & Ad.News, 93d Cong., 1st Sess., pp. 2688, 2706 (1973).

The FEA in its exception process specifically considered the fact that Pasco was created in an effort to further competition in the petroleum industry.[17]

---

**16.** Pasco received a 52% exception for the first quarter of 1975, *Pasco, Inc.,* Case No. FEE–1299 (filed 12–6–74, decided 1–20–75), 3 CCH Energy Management ¶ 83,021; a 100% exception for the second quarter of 1975, *Pasco, Inc.,* Case No. FEE–1676 (filed 5–15–75, decided 6–3–75), 3 CCH Energy Management ¶ 83,168; and an 84.7% exception for the third quarter of 1975, *Pasco, Inc.,* Case No. FEE–1853 (filed 7–31–75, decided 9–17–75), Appendix A to appellants' reply brief filed with this court on October 3, 1975.

**17.** In Pasco's January 20, 1975 exception decision (3 CCH Energy Management ¶ 83,021), the FEA reviewed its decision on an earlier exception application filed by the only other small refiner existing pursuant to an antitrust divestiture decree. The FEA stated in Pasco's decision that in *Navajo Refining Co.,* Case No. FEE–1300 (filed 12–16–74, decided 1–2–75), 3 CCH Energy Management ¶ 83,003, which was an application for an exception from 10 CFR § 212.83, the agency had

> placed great weight on the fact that the firm had purchased the refinery as a part of a U. S. District Court divestiture decree . . . and that Navajo's acquisition was approved only after the firm stipulated to the Court that it would make every effort to expand the capacity of the refinery [and that] [t]he principles established in *Navajo* and related

However, the language above was directed at the possible termination of supply contracts to small refiners which were without other sources of oil.[18] The above quoted passage is no indication to this court that a refiner established as a result of an antitrust divestiture decree must be *totally insulated* from the rising cost of the raw materials on which the entire industry depends. Pasco is an entitlements purchaser due to the exceptional benefit it receives under FEA price regulations. It is the competitive advantage available to Pasco by reason of its greater access to old oil, the price of which is controlled under FEA regulations, which Pasco would contend should be continued without the added cost of its entitlement purchases. In the absence of these price regulations, the cost to Pasco of refining that oil which it produced or obtained from others would have risen with the increase in world oil prices just as such costs have risen for those refiners without access to price-controlled old oil.

Pasco has made no showing of any interruption of its supply agreements or inability to utilize effectively their present refinery capacity. On the contrary, Pasco contends that the FEA's regulations should be so structured as to allow it sufficient capital and opportunity to expand its refining capacities without sharing any portion of the enormous burden of the increase in world oil prices since the company's inception.[19] To as-

---

decisions are clearly relevant to the issues presented by this [Pasco's] case. The Arco divestiture decree and Pasco's concomitant purchase of the Sinclair properties were part of a larger effort by the Department of Justice to reinvigorate and encourage competition in the national petroleum industry and . . . Pasco has developed into the kind of active small competitor the Federal government has sought to foster.

3 CCH Energy Management ¶ 83,021, at p. 83,-057. Navajo Refining Co. received exception relief from 10 CFR § 212.83 under its decision and was allowed to calculate the base price of middle distillates it refined, by an alternative method. 3 CCH Energy Management ¶ 83,003 at p. 83,006.

Navajo subsequently filed an application for a complete exception from 10 CFR § 211.67, the Entitlements program, which was denied on the basis that Navajo failed to show that its entitlement purchases would significantly impair the firm's financial or operational posture. *Navajo Refining Company*, Case No. FEE-1417 (filed 1-23-75, decided 3-12-75), 3 CCH Energy Management ¶ 83,069. Navajo's application for a stay pending appeal was also denied. *Navajo Refining Company*, Case No. FES-0387 (filed 3-26-75, decided 4-11-75), 3 CCH Energy Management ¶ 85,022. Finding that "circumstances surrounding both the Entitlements Program and Navajo's financial posture have changed substantially since Navajo originally applied for" exception relief, the FEA granted Navajo limited relief from the program for the second quarter of 1975 by reducing the old oil receipts as reported by Navajo, on which its purchase obligations were based, by 5.333 per cent. *Navajo Refining Company*, Case No. FEA-0387 (filed 3-26-75, decided 5-2-75), 3 CCH Energy Manage-

ment ¶ 80,581, at p. 80,771. This relief was projected to result in a reduction of the firm's average monthly purchases of entitlements, not including any benefit conferred by any special rules, by 32.4877 per cent.

18. The producing and refining capacities of the property Pasco purchased were not sufficient to meet the product requirements of the marketing system which it inherited from Arco. Therefore, Pasco received certain long-term supply contracts from Arco for crude petroleum, motor gasoline, and middle distillates. These types of contracts, to which Congress particularly directed itself in the Conference Report quoted above, were intended, as recognized by the FEA, "to afford Pasco a reasonable opportunity to expand its crude oil production and refining operations to the point where it could through its own productive resources fully satisfy the requirements of the marketing system which it had acquired." 3 CCH Energy Management ¶ 83,021, at p. 83,054. The Entitlements program of course does not abrogate Pasco's supply agreements in any way. What the program does is spread the dramatic increase in world oil prices over all refiners, big and small, which would have occurred in the absence of such regulation but for the fact that the FEA was maintaining a ceiling price on the sale of approximately 40 per cent of the nation's domestic production. It was the greater access to this price-controlled oil on the part of the major companies as a class that prompted the crude oil equalization or Entitlements program.

19. Pasco has a substantial capital improvements program aimed at becoming independently able to fulfill its marketing system's needs before its long-term supply agreement with Arco expires in 1977, through expansion

sume that Congress intended the Allocation Act to provide competitive advantages to certain companies in the form of granting small refiners access to old oil and the major refiners access only to uncontrolled oil or old oil only upon the purchase of entitlements is to impose a mandate absent from the Act and the Committee Reports. Pasco, a profitable producer-refiner, operating in the petroleum industry, must accept its fair and equitable share of the burdens as well as the benefits of the programs implementing the Allocation Act which the national energy crisis necessitated.

It was the duty of the FEA to enact regulations consistent with a proper interpretation of the Allocation Act's objectives and, having done so, to determine the question of the application or nonapplication of such regulations to companies which are within the purview of the Act. In reviewing the discharge of an agency's function in interpreting the Act, promulgating regulations thereunder and applying and enforcing such regulations, this court has recognized that where administrative control has been congressionally authorized, the "judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." *Pacific Coast Meat Job. Ass'n, Inc. v. Cost of Living Coun.,* 481 F.2d 1388, 1391 (Em.App.1973), which was quoting from *Miss. Valley Barge Co. v. United States,* 292 U.S. 282, 286–287, 54 S.Ct. 692, 694, 78 L.Ed. 1260 (1934). See also *Condor Operating Co. v. Sawhill, supra; Reeves v. Simon,* 507 F.2d 455, 460 (Em.App.1974), cert. denied, 420 U.S. 991, 95 S.Ct. 1426, 43 L.Ed.2d 672 (1975); *Mandel v. Simon,* 493 F.2d 1239, 1240 (Em.App.1974); *University of Southern California v. Cost of Living Council,* 472 F.2d 1065, 1068–1069 (Em.

App.1972), *cert. denied,* 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973).

▇ To be upheld, the action taken by the FEA need not be the same as the court or the appellee might have taken in correcting the problems occurring as a result of the energy crisis and the impact of earlier regulations, so long as the action taken is reasonable. As the district court noted in *Marathon Oil Co. v. FEA* (CA No. 75–36, N.D.Ohio, January 31, 1975), 3 CCH Energy Management ¶ 26,015 at p. 26,152,[20] a "court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). This court has repeatedly recognized the "well settled principle" of the great deference to be granted the interpretations of statutes and implementing regulations by the agency charged with administering them. In *Pacific Coast Meat Job. Ass'n, Inc. v. Cost of Living Coun., supra,* at page 1392, this court, quoting from *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), said:

> When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. "To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Unemployment Comm'n v. Aragon,* 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136. See also *e. g., Gray v. Powell,* 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301; *Universal Battery Co. v. United States,* 281 U.S. 580,

and modernization of its refineries and pipelines and the development of secondary recovery programs for its oil fields.

20. The district court in *Marathon Oil Co. v. FEA,* 3 CCH Energy Management ¶ 26,015, upheld the Entitlements program against Mara-

thon's contentions that it was arbitrary, capricious and unsupported by substantial evidence. This court dismissed Marathon's appeal for lack of jurisdiction. 516 F.2d 1397 (Em.App.1975).

583, 50 S.Ct. 422, 74 L.Ed. 1051. "Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.'" *Power Reactor Co. v. Electricians,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924.

The Supreme Court recently reaffirmed the *Udall* standard of administrative review, in *Fry v. United States,* 421 U.S. 542, 546, n. 6, 95 S.Ct. 1792, 1795, 44 L.Ed.2d 363, wherein it stated: "We have long recognized that the interpretation of a statute by an implementing agency is entitled to great weight. *Udall v. Tallman,* 380 U.S. 1, 16–18 [85 S.Ct. 792, 801–802, 13 L.Ed.2d 616] (1965)." Therefore, as stated in *Condor Operating Company v. Sawhill, supra,* at p. 359: "The party attacking a regulatory scheme must carry the burden of persuasion." *Bowles v. Willingham,* 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944); *American Nursing Home Ass'n v. Cost of Living Council,* 497 F.2d 909 (Em.App.1974).

This burden of persuasion has not been met in this instance. The district court's interpretation of Congressional intent ignored the flexibility incorporated in the Act and the many competing objectives which appear on the face of the statute. The Committee Reports make no statement to the effect that either small refiners as a class or small refiners created pursuant to antitrust decrees should be exempt from any portion of the Act or implementing regulations. Had such exemption been intended, Congress could easily have provided such in the Act when its extension was passed, in December, 1974, since the impending implementation of an entitlements program by the FEA was not only known by Congress but was strongly encouraged by Congressional committees.[21] The inclusion of small refiners as a class and small refiners created pursuant to antitrust decrees in the entitlements regulation, with its exception process for hardship cases, is a valid, rational exercise of the agency's authority under the Act and within relevant expressions of Congressional intent.

---

**21.** The Committee Reports of the Senate and House are quite enlightening on the FEA's authority to promulgate the Entitlements program. At the time of the consideration of the extension of the Allocation Act, the Senate Committee stated that the Act

provides ample authority for the FEA to institute a system of price equalization to provide that all segments of the industry benefit from lower-priced domestic oil. The Committee was urged to amend the Act to achieve this objective but has been assured that FEA intends to institute a price equalization program under existing authority in the immediate future. S.Rep.No.93–1082, Comm. on Interior and Insular Affairs, 93d Cong., 2d Sess. at 2 (Aug. 9, 1974).

Similarly, the House report indicates the same presence of authority for the FEA

to institute a system of price equalization applicable to crude oil, residual fuel oil and refined products to eliminate the regional and competitive inequities which result from a dependence upon high-cost imported oils and petroleum products. The FEA's stated commitment to Subcommittee Chairman Macdonald during the hearings on this bill to move promptly on a price equalization pro-

gram has convinced the Committee that specific amendments to the Act to compel such action may prove to be unnecessary. H.Rep. No.93–1443, 93d Cong., 2d Sess. at 3 (Oct. 8, 1974).

Pasco has not challenged, and we do not decide, the validity of any entitlement purchases required by the FEA beyond the second quarter of 1975 (i. e., beyond purchase obligations arising in August, 1975 for crude oil runs to stills through June, 1975). Therefore, *only* for the purpose of examining Congressional intent with regard to the Entitlements program, it should be noted that in passing the Emergency Petroleum Allocation Act of 1975, which provided that the Allocation Act be effective through November 15, 1975, Congress clearly expressed its intent that all regulations promulgated under the Emergency Petroleum Allocation Act of 1973 (which necessarily includes the Entitlements program as adopted by the FEA and challenged by Pasco in this case, 10 CFR § 211.67) should be considered in force and effect for the period between August 31, 1975 and the date of enactment of the Emergency Petroleum Allocation Act of 1975. 94th Cong., 1st Sess., 121 Cong. Record H. 9193 (Sept. 26, 1975).

The holding of the district court that the Entitlements program is arbitrary, capricious, and beyond the FEA's authority due to its failure to make the differentiation contended for by Pasco not only exhibits a failure to consider the latitude conferred on the FEA by Congress and the great deference extended by the courts to administrative agencies such as the FEA, but also is entirely inconsistent with the court's order that the FEA perpetuate the program in such a manner as to allow Pasco to recover the amount it expended for the one month it met its obligations under the program and allow companies which suffered by reason of Pasco's later refusal to comply with its entitlement purchase obligations, to recover such amounts from other entitlement purchasers. The burden of persuasion is, of course, on Pasco in attacking the program, and we find Pasco has failed to establish that the regulation is arbitrary, capricious, or beyond the agency's authority.

The regulation, by granting entitlements to those refiners with old oil ratios below the national ratio due to their own high production of new, released and stripper well oil, merely provides for the continuation of the monetary incentive which was a fundamental part of the "two-tier" pricing system. The correction of economic distortion and unfair competitive conditions occasioned by the "two-tier" system was considered essential by Congress and the FEA. However, in promulgating the Entitlements program, the agency still had to consider all of the Act's objectives, including the goal of stimulating increased domestic production and exploration. By refining large proportions of its own uncontrolled oil, thereby lowering its old oil ratio below the national old oil ratio and making the producer-refiner eligible to sell entitlements, the producer-refiner has the same production incentive it would receive if it sold its increased production of uncontrolled oil on the free market. This court finds ample support for the entitlements regulation as promulgated by the FEA and, considering the urgent need for action, the implementing agency's program for achieving the varied objectives of the Allocation Act was certainly rational and neither arbitrary, capricious, nor beyond the authority of the agency.

The district court also found that the FEA's modification of the original decision and order in Pasco's application for exception relief and the FEA's denial of Pasco's appeal were not supported by substantial evidence. Following the promulgation of the entitlements provision, Pasco filed an application for an exception and sought a stay of its entitlement purchase obligations, the latter being denied inasmuch as through the operation of Special Rule No. 3 Pasco had not yet purchased entitlements and would not have to do so before the FEA made a final determination of the firm's request for an exception. *Pasco, Inc.,* Case No. FES–1299 (filed 12–16–74, decided 12–20–74), 1 CCH FEA Transfer Binder ¶ 21,668. Pasco's application for an exception was decided on January 20, 1975. *Pasco, Inc.,* Case No. FEE–1299 (filed 12–6–74, decided 1–20–75), 3 CCH Energy Management ¶ 83,021. FEA's decision, based upon the financial information submitted by Pasco relating to the firm's "historical return on equity, return on capital investment, working capital position, profitability, and cash flow" (3 CCH Energy Management at p. 83,-058), reduced Pasco's entitlements purchase obligations, computed without regard to any benefit conferred by Special Rule No. 3, by 52% for the first quarter of 1975.[22] It was determined that such

---

**22.** The relief was granted in optional form, in that for refinery runs for December, 1974 and the first quarter of 1975, Pasco could reduce its entitlement purchase obligations by 52%, computed under 10 CFR § 211.67 without regard to any Special Rules under § 211.67, or compute its obligations for entitlement purchases under § 211.67 and include any benefits conferred by any Special Rules. 3 CCH Energy Management ¶ 83,021, at p. 83,058.

relief would permit Pasco to maintain operations at a level similar to that achieved in its 1974 fiscal year and sufficient to continue its projected expansion efforts.

The FEA, while finding that Pasco's total purchase obligations under the Entitlements program would impose a gross inequity on the firm and significantly impair continuation of its long-range capital investment program, also expressly stated, "Pasco has not made a convincing showing that the firm must be entirely relieved of all obligations to purchase entitlements under the provisions of Section 211.67 in order to main-

tain its present market share and obtain the reasonable level of profits necessary to continue its capital improvement plans." (3 CCH Energy Management at pp. 83,057–83,058). A stay of its decision and order pending disposition of Pasco's appeal was denied by the FEA. *Pasco, Inc.,* Case No. FES–0361 (filed 2–20–75, decided 3–3–75), 3 CCH Energy Management ¶ 85,012. A supplemental order was issued by the FEA *sua sponte,* on April 2, 1975, modifying its January 20 decision to take into account the increase in the cost of entitlements for crude oil runs in January, 1975, from $5 to $6.[23] (3 CCH Energy Management at p. 83,-059).

Special Rule No. 3, the first phase of which was extended through December, 40 F.R. 6197 (Feb. 10, 1975), gave Pasco greater relief for runs during the month of December than it would have received under its January 20, 1975 exception decision. Had the first phase of Special Rule No. 3 not been extended, Pasco would have received greater benefit from its exception decision than was available under the operation of the second phase of Special Rule No. 3. For all of the runs during the first quarter of 1975, Pasco received greater relief under its exception decision than it received under Special Rule No. 3.

In determining appropriate exception relief in each refiner's case, the FEA uses information, submitted with the refiner's exception application, which is basically intended to show the firm's past, present, and projected operations and its financial ability to meet its entitlement purchase obligations. The FEA calculates the financial impact of the Entitlements program and any necessary relief on an annualized basis, while generally granting relief from obligations under the program only on a quarterly basis. The FEA requires the resubmission of exception applications for each quarter before granting any exception relief for further quarters. Of course, certain of the financial figures and ratios computed therefrom are approximations or projections and in some cases have to be measured over relatively short periods of time. Pasco entered the petroleum industry only two years ago; thus any projection based on historical averages is subject to considerable variation. This is witnessed by the fact that Pasco asserted in its second quarter exception application that its actual results for the first quarter were much worse than Pasco had projected in its own first quarter exception application. 3 CCH Energy Management at p. 83,533. Further, in the FEA decision and order of Septem-

ber 17, 1975, *Pasco, Inc.,* Case No. FEE–1853 (filed 7–31–75, decided 9–17–75), Appendix A to appellants' reply brief, it is noted by the FEA at p. 5, n. 4, that Pasco's

actual consolidated financial results for the first six months of Pasco's current fiscal year which the firm provided in connection with its current submission indicate that Pasco achieved a level of profitability during that period which substantially exceeded the projections previously submitted by the firm and which formed the basis of the *Pasco II* [Pasco's second quarter exception application] Decision.

Clearly it is a reasonable and rational choice on the part of the FEA to grant exception relief from the Entitlements program on a quarterly basis using certain annualized projections and the refiner's quarterly submissions which include the refiner's actual financial results up to the filing date and the refiner's projections for upcoming quarters.

**23.** In this supplemental order, the method of calculating the relief granted to Pasco was changed to incorporate the method of granting relief subsequently adopted by the FEA in issuing other exception decisions following Pasco's January 20, 1975 decision. The new method utilized in the supplemental order provided that Pasco could compute its entitlement purchase obligations for April and May, 1975, without regard to the benefit conferred by any Special Rules, by reducing its reported old oil receipts for runs during February and March, 1975, by 19.08%, or by calculating its obligations under 10 CFR § 211.67, including any benefit contained in any Special Rules. This relief was calculated by the FEA to give Pasco relief from 60% of its entitlement obligations on a monthly basis. 3 CCH Energy Management ¶ 83,021 at p. 83,059–4.

Pasco admitted in its appeal submitted on February 20, 1975, that assuming only the relief granted in the January 20 decision and order was continued, the firm would still realize net income in 1975 approximately equal to the average of its two previous years' operations. On May 9, 1975, the FEA concluded that its January 20 decision and order was based upon a careful and extensive review of Pasco's entire factual submission in its application for an exception and that the January 20 decision was neither arbitrary nor capricious nor erroneous in fact or law, and the FEA denied Pasco's appeal from the decision and order. *Pasco, Inc.,* Case No. FEA–0361 (filed 2–20–75, decided 5–9–75), 3 CCH Energy Management ¶ 80,587. Pasco contended in its appeal that its after-tax profit for 1975 should be maintained, through an exception to the Entitlements program, at at least the same level as 1974 profits. The FEA found, however, that such a guarantee of profitability was not required by its "hardship" exception process. Pasco applied for exception relief in the second quarter of 1975 and received a 100% exception from all purchase obligations.[24] *Pasco, Inc.,* Case No. FEE–1676 (filed 5–15–75, decided 6–3–75), 3 CCH Energy Management ¶ 83,168.

■ The review of administrative determinations of exceptions from the complex programs necessary to deal with the petroleum industry and the determination of administrative appeals therefrom requires special attention to the "great deference rule" discussed above. Administrative decisions based upon analysis of the data and information submitted on applications for exception relief require the application of administrative expertise, and this court should

not be quick to overturn them. In *Consumers Union of U. S., Inc. v. Cost of Living Council,* 491 F.2d 1396, 1403 n. 2 (Em.App.1974), *cert. denied,* 416 U.S. 984, 94 S.Ct. 2387, 40 L.Ed.2d 761 (1974), this court quoted from *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970), which stated: "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." Finding a rational basis for its regulations, no abuse of its administrative procedures or its discretion, and substantial evidence to support its determinations as to Pasco, we find, from a thorough review of the record, that the FEA's original decision and order, its modification, and the denial of an appeal therefrom should be upheld in this case, and that the decision of the district court to the contrary is clearly erroneous.

■ Finally, the district court further concluded that the defendants failed to comply with provisions of the Freedom of Information Act, 5 U.S.C. § 552(a)(1), in that they failed to identify or describe the decision review committee which reviews all exception appeal decisions. The FEA has, however, published regulations which set forth in a specific and comprehensive manner the procedures governing the appeal of FEA exception decisions. 10 CFR § 205, Subpart H, 39 F.R. 1924 (January 15, 1974). These regulations indicate that the appeal is to be filed with the Office of Exceptions and Appeals, unless based upon an order issued by a Regional office, which then must be filed with that regional office. In addition, the regulations state the essential contents of the appeal and the FEA evaluation procedure. The regula-

---

**24.** The fact that Pasco received a 100% exception for the second quarter of 1975 does not, by itself, as intimated by the district court, indicate that Pasco deserved a 100% exception for the first quarter of 1975. It does indicate that the FEA was not inflexible in its exception decisions and, being sensitive to: the decline in the national old oil ratio and the rise in Pasco's old oil ratio; the increase in the cost of entitlements; the merits of Pasco's excep-

tion application for the first quarter; the relief granted therein, including the burden of Pasco's entitlements obligations as yet not purchased for crude oil runs during any month of the first quarter of 1975; and the financial and operational picture of the firm as reflected by its May 15, 1975 exception application, the FEA determined that Pasco was entitled to further and in fact complete relief for the second quarter of 1975.

tions do not, in fact, mention an appellate review committee; however, an appellant within the FEA administrative process has no right to appear before this committee,[25] thus knowledge of the committee or its membership could not affect an applicant's preparation of its appeal.[26]

The Freedom of Information Act specifically provides that section 552 does not apply to matters that are "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). This section has previously been interpreted to the effect that it does not require all internal delegations of authority to be published. *Hogg v. United States,* 428 F.2d 274, 280 (6 Cir. 1970), *cert. denied,* 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 808 (1971). In finding the procedures of an agency to be outside the purview of this section's predecessor, 5 U.S.C. § 1002, the court in *T.S.C. Motor Freight Lines, Inc. v. United States,* 186 F.Supp. 777, 786 (S.D.Tex. 1960), affirmed, *per curiam,* 366 U.S. 419, 81 S.Ct. 1356, 6 L.Ed.2d 387 (1961), found that the unpublished procedure of notation voting by the Interstate Commerce Commission did not "purport to inform parties of the procedure which is to be taken for the presentation of matters to the Commission. It is not designed for the guidance of the public because it in no way affects any steps which interested parties must take or not take in order to obtain, or review, action by the Commission."

This interpretation has been similarly applied to section 552 in *Hogg v. United States, supra,* at page 280, wherein it was stated: "Under the provisions of 5 U.S.C. § 552, the requirement for publication attaches only to matters which if not published would adversely affect a member of the public. See S.Rep.No. 813, 89th Cong., 1st Sess., p. 6, H.Rep.No. 1497, 89th Cong., 2nd Sess., p. 7, 2 U.S. Code Cong. & Ad.News, pp. 2418, 2424." This court recognizes that the Allocation Act, under section 5(a)(1), incorporated section 207, the administrative procedure section of the Stabilization Act, which section excluded administrative functions exercised under these titles from the Administrative Procedure Act, with the express exception of the requirements of, *inter alia,* 5 U.S.C. § 552. However, it cannot be said that such provisions have been violated or that Pasco was in any way affected or prejudiced by the lack of any publication of an identification or description of the Decision Review Committee.

We conclude that the FEA regulations and orders challenged by Pasco are valid and that the decision of the district court to the contrary is clearly erroneous.

The judgment of the district court is reversed and remanded, with instructions to deny plaintiff Pasco relief and to dismiss its action on the merits, and to reinstate the counterclaim of the United States and expeditiously proceed to appropriate disposition thereof, consistently with this decision.

**25.** A party appealing an FEA exception decision may, pursuant to 10 CFR § 205.105(d), request that a conference or hearing regarding the appeal be held. Also, the FEA on its own initiative may convene a conference or hearing on the appeal under 10 CFR § 205.106. If, under the guidelines established in 6 CFR § 205, Subpart M, it is determined that a hearing will be held, the FEA then designates one agency official to conduct the hearing pursuant to 10 CFR § 205.172.

**26.** As this court stated in *Carpenters 46 County Conference Board, et al. v. The Construction Industry Stabilization Committee, et al.,* 522 F.2d 637 (Em.App.1975), at note 5, section 207 of the Stabilization Act, 12 U.S.C. § 1904 note (1975 Supp.), incorporated into the Allocation Act by section 5(a)(1) thereof, 15 U.S.C. § 754(a)(1), "exempts agency action under the Act from most of the provisions of the Administrative Procedure Act, title 5, United States Code, including § 556 on the conduct and right of participants in administrative hearings."