HUSKY OIL COMPANY, Plaintiff,

v.

DEPARTMENT OF ENERGY and James
W. Schlesinger, Secretary of
Energy, Defendants.

No. C77–190–B.

United States District Court,
D. Wyoming.

March 13, 1978.

David H. Lloyd, Jeffrey A. Burt and Michael T. Scott of Arnold & Porter, Washington, D. C., James R. Learned, Cheyenne, Wyo., and Karl F. Anuta and Joseph K. Reynolds of Husky Oil Co., Denver, Colo., for plaintiff.

Toshiro Suyematsu, Asst. U. S. Atty., D. Wyoming, Cheyenne, Wyo., Lee Allen and Nancy C. Crisman, Dept. of Energy, Washington, D. C., for defendants.

## MEMORANDUM OPINION

BRIMMER, District Judge.

The plaintiff, Husky . Oil Company (Husky), brought this action seeking injunctive relief from a final administrative order of the Department of Energy (DOE) denying Husky's application for an adjustment in the standard of exception from the crude oil entitlement program. 10 CFR Section 211.67. This Court has jurisdiction over the action pursuant to 15 U.S.C. Sections 754(a)(1), 766(i)(2)(B), 28 U.S.C. Sections 1331, 1337 and 2201, and venue is properly in the District Court for the District of Wyoming by virtue of 28 U.S.C. Section 1391(e).

Husky is a corporation organized under the laws of Delaware with its principal place of business in Cody, Wyoming. Husky operates petroleum refineries in Cody and Cheyenne, Wyoming as well as in North Salt Lake, Utah. These refineries have a combined capacity of less than 175,000 barrels of crude oil per day, which qualifies Husky as a small and independent refiner under the Emergency Petroleum Allocation Act of 1973 (EPAA), 15 U.S.C. Section 752(3)(4). DOE is a department of the executive branch of the United States Government and the Defendant, James R. Schlesinger, is the Secretary of that department.

EPAA, as amended and extended, 15 U.S.C. Section 751 *et seq.* was enacted by Congress on November 27, 1973 in response to an oil embargo imposed on the United States by the Organization of Petroleum Exporting Countries in the fall of 1973. Acting pursuant to EPAA the President established the Federal Energy Office (FEO), delegating to it all authority vested in the President by that Act. 38 Fed.Reg. 33575 (Dec. 6, 1973). The FEO acting in accordance with its delegated authority instituted mandatory petroleum allocation and price regulations which have been continued until the present time by the FEO's successor, the Federal Energy Administration (FEA), and in turn by its successor, the Defendant DOE. 29 Fed.Reg. 744 (January 2, 1974), 39 Fed.Reg. 1924 (January 15, 1974), 39 Fed.Reg. 23185 (June 27, 1974), 42 Fed.Reg. 23185 (June 27, 1974).

The regulations which were promulgated by the FEO resulted in a two-tier pricing system. This system imposed a price ceiling on domestic crude oil produced from particular properties, which was equal to or less than the level of production from that property in the same month of 1972 (old oil). Crude oil produced in excess of 1972 production levels from the same properties as well as newly discovered and certain imported oil was exempted from price ceiling controls (new oil).

The two-tiered pricing system created competitive disadvantages between refiners. Those refiners which relied more heavily on new oil incurred much higher crude costs than those having greater access to the lower priced old oil. To ameliorate these disadvantages the FEA promulgated the Old Oil Allocation Program also known as the Entitlements Program. 10 CFR Section 211.67, 39 Fed.Reg. 42246 (December 4, 1974). Under the entitlement program the defendant tabulates the proportion of old oil refined by all domestic refiners each month on a nationwide basis. Refiners with greater access to old oil than the national average, are required to make cash payments by means of entitlement purchases, to those refiners with less access to old oil than the nationwide average. *Pasco Inc. v. FEA,* 525 F.2d 1391, 1395 (Em.App.1975); *Cities Services v. FEA,* 529 F.2d 1025 (Em. App.1975). Thus, the program redistributes the benefits of the low cost old oil and the burden of the higher priced new oil, without requiring the physical movement of supplies.

Not long after the entitlement program went into effect, it became apparent that the economic viability of some small refiners, whose access to old oil exceeded the national average, was jeopardized by the mandatory cash payments. This was primarily due to the relatively higher operating costs and capital expenditure incurred by small refiners and the lower prices at which they marketed their products. *Marathon Oil Company v. FEA,* 3 Energy Mgmt. Reptr. 26015 at 26149 (1975). The adverse impact of the entitlement program on small refiners was in conflict with one of the stated goals of EPAA which required that the regulations shall "to the maximum extent practicable" provide for:

" . . . . the preservation of an economically sound and competitive petroleum industry; including priority needs to restore and foster competition in the producing, refining, distribution, marketing . . . sectors of such industry, and to preserve the competitive viability of independent (and) small refiners . . . ."
15 U.S.C. Section 753(b)(1)(D).

In recognition of these congressional concerns, the FEA has established exception and appeal procedures for small refiners. This exception process was mandated by 15 U.S.C. Section 766(i)(1)(D) which stated:

"Any officer or agency authorized to issue the rules, regulations, or orders described in paragraph (A) shall provide for the making of such adjustments, consistent with the other purposes of this chapter, as may be necessary to prevent special hardship, inequality . . . ."

The defendants' regulations also reflect this intent at 10 CFR Section 205.50:

"(a)(1) This subpart establishes the procedures for applying for an exception from a regulation, ruling or generally applicable requirement based on an assertion of serious hardship or gross inequity . . ."

Congress, nevertheless, concluded that a further and an across-the-board exemption of small refiners was necessary. It therefore passed Section 403(a) of EPAA, P.L.No. 94–163, 15 U.S.C. Section 753(e) which excepted small refiners from entitlement purchase obligations for the first 50,-000 barrels of crude per day, if such refiner had a total refining capacity of less than 100,000 barrels per day. In enacting this exemption, the House Committee on Interstate and Foreign Commerce stated,

"The Federal Energy Administrations' Crude Oil Equalization Program (Entitlement Program), 10 CFR 211.67, requires cash transfers among the Nation's refiners, now totalling over $100,000,000 each month. One of the stated goals of the program was to assist the small refiners throughout the country. The entitlements program, however, has had a particularly harsh effect on small refiners relative to its effect on their larger competitors . . . Data for the most current month (June purchases for April refinery operations) indicates that some 34 small refiners were required during June to pay out almost $30,000,000, while 11 large oil companies were to receive over $62,000,000." 2 U.S.Code Congressional

and Administrative News, p. 1809 (1975). H.R.Rep.No. 30, 94th Congress 1st Sess. 48 (July 9, 1975).

Subsequent to the passage of Section 403(a) the FEA submitted a proposal which, pursuant to 15 U.S.C. Section 760a(g), authorized the agency to revoke the exemption unless such revocation was overruled by either House of Congress. The revocation was permitted and small refiners have since been required to apply to the defendants' office of administrative review, to seek relief from any hardship and inequity resulting from the purchase obligations under the entitlement program.

The general criteria now governing relief for small refiners from the entitlement program was announced in the FEA's decision in Delta Refining Co., 2 FEA ¶ 83,275 (September 1975). Under *Delta,* the defendant grants the minimum amount of exception relief necessary to permit a firm to achieve, in its current fiscal year, either its historical profit margin or its historical return on invested capital. A firm's historical profit margin is calculated by averaging the profit margins achieved during 1968–1974, the seven fiscal years immediately preceding the inception of the entitlements program, while the historical return on invested capital is computed by finding the arithmetic average of the return on invested capital in the best four of those seven years.

However, the defendant also has recognized that strict application of the *Delta* criteria would not always correctly portray a small refiner's historical profit margin:

"  .  .  .  the firm established that strict application of these criteria would not alleviate a serious hardship or gross inequity suffered by the firm as a result of the Entitlements Program. Thus, for example, in those instances in which extraordinary financial difficulties are still present as a result of factors such as insufficient cash flow from operations during the current par or if there is a lack of historical operating data or other unusual circumstances, appropriate adjustments would be made in the exception relief extended." 40 Fed.Reg. 33490 (August 8, 1975).

The DOE has, therefore, departed from the *Delta* criteria where such unusual circumstances have arisen. Wickett Refining Co., 2 FEA ¶ 83,238 (1975); Famariss Oil Corp., 2 FEA ¶ 83,080 (1975); Powerlane Oil Co., 2 FEA ¶ 83,096 (1975); OKC Corp., 2 FEA ¶ 80,604 (1975).

The FEA has also eliminated the production activities of a small refiner and the proceeds therefrom when determining its historical profit levels. As stated in *Delta,* supra at 83,802, the inclusion of such activities "  .  .  .  might distort the financial position of the refining and marketing operations and serve as a disincentive to the expansion of production activities.  .  . "

In applying for entitlement relief, a small refiner submits financial projections for its current fiscal year. The Defendant DOE measures those projections against the historical operating figures under the *Delta* criteria, and then determines the amount of relief necessary to permit the refiner to achieve its historical level. The defendant also has authority to conduct a year-end review of exceptions relief on the basis of actual audited financial data, in the course of which provisional exception relief based on the projected financial data is reconciled with the actual audited data and an appropriate adjustment of relief is made. If the actual financial results exceed its projections and the small refiner realizes an amount in excess of its historical profit margin, the refiner can be obligated to make entitlement purchases. *Delta Refining Co. v. FEA,* 559 F.2d 1190 (Em.App. 1977).

In February, 1975, Husky filed its initial application for exception relief from the entitlements program. The FEA, upon review of the data submitted to it by the plaintiff, eliminated three years from Husky's data base after determining that those years were unrepresentative of the historical period because of unusual expenses incurred in refinery expansion. The FEA found that without exception relief the impact of the entitlement program

would "seriously affect the firm's competitive position." Exception relief was therefore granted from April through June 1975. Husky Oil Company, 2 FEA ¶ 83,146 (March 1975). Husky continued to be excused from entitlement purchases in the succeeding months due to an extension of exception relief, or to the Section 403(a) exemption, *supra,* or because the plaintiff was a net seller of entitlements.

On October 20, 1976 the plaintiff again submitted an application for extension of exception relief. It alleged that in the absence of such relief it would incur severe hardship and gross inequity. In the application Husky asserted that it had sustained substantial losses in each of the years 1968 through 1973. Those losses were attributed to the plaintiff's acquisition of the refining and marketing facilities of a failing company, Frontier Refining Company, as well as extraordinary capital expenditures for refinery expansion, refinery operation, and the production and refining of non-leaded gas and wax crude. As a result of those factors, Husky's historical profit margin for 1968–1974 was a negative 2.30, as computed under the *Delta* criteria. The plaintiff therefore sought relief from a strict application of the Delta standards, since a negative 2.30 historical profit margin would require Husky to sustain more than 5 million dollars in losses for 1977 due to entitlement purchasers obligations. Husky requested, *inter alia,* that the FEA fix a profit margin of 3 percent for fiscal year 1977 which was a level of profitability which the Cost of Living Council had found to be the minimum necessary to prevent severe hardship. 37 Fed.Reg. 5044 (March 1974).

On December 15, 1976 the FEA granted Husky relief from entitlement purchase obligations through May of 1977. In so holding, the FEA again acknowledged the unusual circumstances which had occurred in Husky's operation during the historical period and accordingly deleted the years 1968–1970 from its calculations. The resulting historical profit margin based on the years 1971–1974, was a negative 1.47. Husky Oil Co., 4 FEA ¶ 83,244 (December 1976). The plaintiff appealed from this order contending that establishment of a negative profit margin was grossly unfair and that unless exception relief was decided on the basis of a positive profit margin, the company's future financial viability would be threatened, but the FEA subsequently denied Husky's appeal. Husky Oil Company, 5 FEA ¶ 80,649 (June 2, 1977). The FEA found that Husky had failed to demonstrate that application of the *Delta* criteria would result in a gross inequity or serious hardship. The defendant further determined that exception relief should not be granted in order to allow a firm to enhance its own operating profits at the expense of all other firms. The FEA finally found that the use of a negative profit margin for the purposes of evaluating exception relief would in no way prevent Husky from achieving a positive profit margin. In reaching these conclusions, the Defendant DOE stated:

"The financial results which a firm reports for refining and marketing can vary to a significant extent depending upon the accounting methods which a firm utilizes. For example, the use of certain accelerated depreciation methods and inventory accounting methods could enable a firm to report a relatively high level of depreciation expenses and costs of goods sold and a low level of net income. *It is possible* that this situation exists in the present case and that the financial loss posture which Husky reported for its refining and marketing operations *for the period 1971 through 1974* is in large part attributable to the firm's choice of account methods." 5 FEA at 81,284. (Emphasis supplied).

The defendant went on to hold that:

"A comparison of Tables A and B indicates that Husky has chosen accounting methods during the 1968 through 1973 period which yielded a pre-tax profit for Husky's combined crude oil production, refining and marketing operations, while yielding pre-tax losses for its petroleum, refining and marketing operations. . . ."

In this regard it is important to note that a portion of a firm may report losses for a period of time while the overall busi-

ness enterprise is nevertheless a very viable operation. 5 FEA at 81,285.

Husky sought to reopen the appeal by filing an administrative "Request for Supplemental Order, Correction and/or Modification or Rescission" pursuant to 10 CFR 205.130. Husky asserted that by virtue of the incorrect assumptions and unsupported speculations regarding its accounting procedures, the proceedings must be reopened and the appeal judged in light of the evidence in the administrative record. The FEA dismissed Husky's request for reconsideration on July 8, 1977. In that order the defendant stated that references to the plaintiff's accounting were merely illustrative and not findings of fact.

Husky was, nevertheless, exempted from entitlement purchase obligations through November 1977 based on the financial projections submitted to the defendant. Husky Oil Co., 6 FEA ¶ 83,009 (June 1977). Husky has however exceeded its earlier projections and now forecasts a 2.6 million dollar profit in its refining and marketing operations or a one percent profit margin. In accordance with the defendants' June 2, 1977 imposition of a negative 1.47 historical profit margin, Husky will be required to expend in excess of 6.6 million dollars in entitlement purchases and consequently sustain a loss of nearly 4 million dollars in its refining and marketing division.

The plaintiff brought this action seeking review of and relief from the negative 1.47 historical profit margin established in the defendants' June 2, 1977 order. Husky contends that the FEA's decision was arbitrary and capricious in that it was founded on speculation, improper considerations and failed to take into account the unusual circumstances affecting the plaintiff's historical period. Husky further asserts that a negative 1.47 percent historical profit margin would be grossly unfair, cause severe hardship and threaten its economic viability. On the other hand, the DOE contends that a negative profit margin of 1.47 percent is a proper reflection of the plaintiff's historical period and that a deviance from the *Delta* criteria would be inequitable.

The defendants additionally allege that Husky has at no time demonstrated a gross inequity or severe hardship. There being no genuine issue of any material fact, the matter is now before the Court upon the parties' cross motions for summary judgment.

The administrative history of this case would be incomplete without noting that subsequent to the commencement of this action, the DOE issued two further proposed decisions regarding Husky, both of which would effectively require the plaintiff to begin making entitlement purchases. The first of these orders, dated December 2, 1977, proposed to restore the years 1968–1970 to Husky's historical base period, thereby adjusting the plaintiff's historical profit margin to a negative 2.29 percent. 6 FEA _____. (December 2, 1977). Plaintiff asserts that rather than costing it a 4 million dollar loss, this would cost it a 6 million dollar loss. The second proposed decision, announced on December 20, 1977, the very day on which DOE attorneys in oral argument were vehemently defending the previous June 2, 1977 order, abandons the historical profit margin prong of the *Delta* criteria and utilizes the return on invested capital standard. Pursuant to that determination, Husky would be denied an extension of exception relief since the plaintiff's return on invested capital for fiscal 1977 is in excess of its historical return on invested capital. (Positive 1.24 percent). 6 FEA _____. (December 20, 1977). Husky asserts that this order would further punish it by forcing it to incur a 12 million dollar loss.

■ This Court is well aware of the mandates governing the review of orders made by the DOE. Section 211(d)(1) of the Economic Stabilization Act of 1970, as amended, which is incorporated by reference in Section 5(a)(1) of the EPAA, 15 U.S.C. Section 754(a)(1), states:

" . . . No order of such agency shall be enjoined or set aside, in whole or in part, unless a final judgment determines that such order is in excess of the agency's authority, or is based upon find-

ings which are not supported by substantial evidence."

It is not necessary that the result of the agency action would have been the same result reached by the Court, so long as there exists a rational basis for the agency's actions. *Pasco Inc. v. FEA et al.*, 525 F.2d 1391 (Em.App.1975). Applying these standards to the case at bar, the defendant's orders nevertheless cannot stand.

The legislative history of the entitlements program, as previously outlined, vividly depicts a Congressional intent to provide for the economic viability of the small refiner. The subsequent decisions and orders of the defendant clearly reflect its attempts to comply with that intent.

For example, in Wickett Refining Co., 2 FEA ¶ 83,238, Wickett demonstrated that it would incur a loss in excess of 1 million dollars for fiscal 1976. The firm had not operated a refinery during the historical period 1968–1974. The FEA granted entitlement relief sufficient to allow Wickett to attain a return on invested capital equal to the average earned by a selected group of small refiners. The average return on invested capital for this group was 10.9 percent. The FEA stated that, "such relief will alleviate the financial hardship which the Entitlements Program would otherwise impose upon Wickett, and will . . . permit the firm to realize a return on investment similar to that of other refiners." Wickett, *supra* at 83,769.

The defendant, or its predecessors, have also departed from a strict application of the *Delta* criteria where unusual circumstances have distorted a firm's historical period. Famariss Oil Corp., *supra*, Powerlane Oil Co., *supra*, OKC Corp., *supra*. The defendant in OKC Corp., *supra*, explained the agency's rationale in that regard:

> Thus, in one line of cases . . . the FEA observed that during an early period of time each of these firms experienced unusual costs and extremely low profitability as a result of their efforts to significantly expand their refining capacity. The early years do not reflect the results of the refinery expansion but yet do reflect for certain periods the expenses which were incurred in expanding refinery capacity. As a result, the financial results in these early years were very significantly different from the financial results in the firm's more recent years of operation. The early years in which the distorted financial results occurred were therefore eliminated from the calculation of the firm's historical operating and financial position in order to (i) arrive at a more representative picture of the firm's current business activities; (ii) take into account the fact that the firm had been fulfilling an important national objective of enhancing domestic refining capacity; (iii) take into account the existence of a gross disparity between the profit margin which the firm realized prior and subsequent to the refinery expansion; (iv) alleviate the impact of FEA regulatory requirements which would prevent the firm from attaining a reasonable operating and financial posture in the current period in view of its anticipated volume, current refining operations and previous business activities.

The defendant, in decision after decision, whether in granting or denying relief from entitlement purchase obligations, has always fully considered the effect any such order would have on the viability and operating posture of the firm involved. See i. e. J&W Refinery Co., 2 FEA ¶ 83,233 (August 1975); San Joaquin Refinery Co., 2 FEA ¶ 83,130 (April 1975); Sabre Refining, Inc., 4 FEA ¶ 83,010 (July 1976); Rock Island Refinery Co., 6 FEA ¶ 80,506 (June 1977); Southland Oil Co., 5 FEA ¶ 80,505 (December 1976).

But, that has not been the case in the matter presently before the Court. Since the inception of the Entitlements Program the defendant has granted exception relief to more than 30 small refiners. In oral argument the defendants' counsel admitted that Husky is the only one of 36 small refiners in the United States with a negative profit margin and that all other small refiners have affirmative profit margins

and have received exceptions to the entitlements program.[1]

This is the only instance where the defendants have applied the *Delta* criteria so as to lock a company into a negative profit margin thereby threatening its competitive viability. It is glaringly apparent from the June 2, 1977 Order that the DOE decision was in large measure based on speculation regarding the plaintiff's accounting methods. The FEA theorized in its June 2, 1977 Order that Husky's low level of profitability may have been due to the plaintiff's choice of accounting principles, saying, "*It is possible* that . . . ." (5 FEA, *supra,* Page 81,284). Such supposition and conjecture is not supported by the record in this case. The ruling of the defendant's Office of Exception and Appeals which said that references to accounting methods were only "illustrative" is unpersuasive, especially when that order itself casts doubts on Husky's accounting practices by stating:

It appears that Husky mistakenly believes that those portions of the June 2 Decision and Order which discuss various accounting situations which might cause any firm to continue to operate a subsidiary which was losing money were findings of fact with regard to Husky. However, the discussions of accounting practices presented in the June 2 Decision

were intended to be illustrative . . . . *However, the firm has failed to present any material which would alter the fact that Husky continued to operate its refining and marketing operations despite the negative profit of those operations.* (July 8, 1977 Order, Pages 2–3). (Emphasis supplied).

The June 2, 1977 Order is further founded upon consideration of the plaintiff's crude oil production activities. The defendants plainly take note of the fact that Husky's combined crude oil production, refinery and marketing operation has yielded a pre-tax profit. That finding is in direct conflict with the DOE's own rules. In Delta Refinery Co., 2 FEA, *supra,* at 83,882, and inexplicably in the June 2, 1977 Order itself, the FEA stated that a firm's crude oil production activities are not to be considered in determining whether exception relief is warranted. If those portions of the FEA's decision dealing with accounting methods and crude oil production are disregarded, it becomes virtually impossible, in light of all the evidence, to understand the basis for the defendant's order.

The evidence actually presented to the FEA demonstrates that during the plaintiff's historical period, Husky expended large sums of capital on refinery expansion and development. Between 1968–1974 the

1. The small refiners receiving exception relief from entitlement purchase obligations include: Arizona Fuels Corp., 5 FEA ¶ 83,033 (January 1, 1977); Beacon Oil Co., 6 FEA ¶ 83,003 (June 14, 1977); Charter Oil Co., 5 FEA ¶ 83,101 (March 11, 1977); Delta Refining Co., 2 FEA ¶ 83,275 (September 18, 1975); Dillman Oil Recovery Inc., 4 FEA ¶ 83,242 (December 14, 1976); Edgington Oil Co., Inc., 6 FEA ¶ 83,005 (June 14, 1977); Famariss Oil Corp., 2 FEA ¶ 83,277 (September 18, 1975); Fletcher Oil and Refining Corp., 3 FEA ¶ 83,223 (June 18, 1976); Good Hope Refineries, 3 FEA ¶ 83,224 (June 18, 1976); J&W Refining, Inc., 5 FEA ¶ 83,133 (April 13, 1977); Kern County Refinery, 4 FEA ¶ 83,246 (December 15, 1976); Laketon Asphalt Refining, Inc., 5 FEA ¶ 83,064 (February 11, 1977); Little America Refining Co., 5 FEA ¶ 83,093 (March 11, 1977); Lunday-Thagard Oil Co., 6 FEA ¶ 83,013 (June 14, 1977); Midland Cooperatives, Inc., 2 FEA ¶ 83,283 (September 17, 1975); Mid-Tex Refining, 2 FEA ¶ 83,090 (March 27, 1975); Mohawk Petroleum Corp., Inc., 6 FEA ¶ 83,015 (June 14, 1977); Navajo Refining Co., 6 FEA ¶ 83,017 (June 14, 1977); Newhall Refining Co., 2 FEA ¶ 83,287 (September 18, 1975); NGL Supply, Inc., 3 FEA ¶ 83,004 (November 14, 1975); North American Petroleum Corp., 2 FEA ¶ 83,261 (July 31, 1975); Northland Oil and Refining Company, 3 FEA ¶ 83,063 (December 31, 1975); OKC Corp., 6 FEA ¶ 83,038 (July 14, 1977); Pasco, Inc., 3 FEA ¶ 83,232 (June 18, 1976); Powerine Oil Co., 5 FEA ¶ 80,603 (April 11, 1977); Rock Island Refining Corp., 3 FEA ¶ 83,233 (June 17, 1976); Sabre Refining, Inc., 6 FEA ¶ 83,031 (July 5, 1977); San Joaquin Refining Co., 6 FEA ¶ 83,018 (June 14, 1977); Southland Oil Company, 4 FEA ¶ 83,258 (December 15, 1976); Sunland Refining Corp., 3 FEA ¶ 83,236 (June 14, 1976); The Oil Shale Corp., 2 FEA ¶ 83,289 (September 16, 1975); VGS Corp., 2 FEA ¶ 83,280 (September 17, 1975); Warrior Asphalt Co., 3 FEA ¶ 83,237 (July 17, 1976); West Coast Oil Co., 2 FEA ¶ 80,729 (November 3, 1975); Wickett Refining Co., 2 FEA ¶ 83,343 (October 24, 1975); Young Refining Corp., 4 FEA ¶ 83,264 (December 15, 1976).

plaintiff's refinery capacity increased nearly 500 percent. In 1973 and 1974 alone Husky spent more than 20 million dollars on its refining program. These occurrences first prompted the FEA to eliminate the years 1968–1970 as representing unusual circumstances not indicative of Husky's operating posture. But, since the plaintiff commenced this action, the DOE has submitted a proposed order which in effect states that these circumstances were not so unusual and therefore proposed to adjust the plaintiff's historical profit margin to a negative 2.29 percent.

The evidence also indicates that a negative 1.47 percent historical profit margin would threaten the plaintiff's refining and marketing operation. Mr. R. M. McManis, an executive vice president of Husky stated in this regard that:

> As an integrated petroleum company Husky must look at each phase of its business and structure its operations so that each departmental function carries its own loan and remains a viable entity. Thus if one functional area continually shows that its operations cannot return a reasonable profit, the operations of that area or function must be modified, or, if changes are not possible, terminated. Other functional lines, especially exploration for and production of crude oil cannot be expected to subsidize refining and marketing. . . . *As a result of* a 5.2 million dollars "refund" and a *continued requirement for a negative profit margin, the ultimate collapse of Husky's refining and marketing operation would almost be assured* (Adminis.R. pages 165–168). (Emphasis Supplied).

McManis went on to say that a negative profit margin would curtail proposed capital expenditures needed for refinery expansion, improvement and maintenance. Therefore, if the refining and marketing division were to remain operational in the face of required entitlement purchases, the plaintiff would necessarily have to cut back in exploration and production. Yet, one of the admitted objectives of EPAA is to stimulate production.

The threat to plaintiff's competitive viability is further emphasized by considering the effect of a positive profit margin on other small refiners. Due to the obvious increase of the price of refined products and the resulting increased profits, a small refiner with a positive historical profit margin is presently able to achieve greater earnings than it did during the historical time period and yet not be required to purchase entitlements. On the other hand, the plaintiff's negative historical profit margin has the converse effect. During the years 1971 through 1974 Husky's negative profit margin of 1.47 percent translated into an average annual loss of $504,500. The same profit margin on projected sales yields over 3.9 million dollars in losses for fiscal 1977. While other small refiners are permitted, under the entitlement program, to achieve greater profits than those attained during the historical period, Husky must lose over seven times more than its average loss during 1971–1974 simply because of mandated entitlement purchases.

The defendant's assertion that a negative profit margin does not act as a profit ceiling is without merit. The contention may be theoretically accurate, but it is not realistic, as is illustrated by the plaintiff's four million dollar loss on a 1 percent profit for fiscal 1977.

Such a result was never contemplated by Congress. The EPAA specifically mandates that the competitive viability of the small and independent refiner must be maintained to the maximum extent practicable, 15 U.S.C. Section 753(b)(1)(D). The Congress in no uncertain terms underscored this point with the enactment of the Section 403(a) exemption. That intent has consistently been reflected in the subsequent orders and decisions of the defendant. DOE appears to have ignored the operating viability of a small refiner in this case alone.

The defendant's conduct toward Husky in this matter can only be termed arbitrary, capricious, and discriminatory. The locking of plaintiff into a negative profit margin on the basis of unsupported speculation relative to accounting methods

and the consideration of Husky's production activities was improper, not only in the light of the actual facts, but also in the light of DOE's own decisions. Moreover, in filing its motion for summary judgment, the DOE attached an article from *The Wall Street Journal* concerning the positive operating posture of the plaintiff's Canadian sister company. There is hardly a law student in the land who would not recognize the gross impropriety of attempting to influence the Court by matters de hors the actual record. This submission only accentuates the defendant's reliance on matters wholly irrelevant to the issue of entitlement relief. DOE feigns slavish adherence to *Delta*, but obviously ignores its own injunction therein that crude oil production must not be considered.

The defendant's two most recent proposed orders regarding Husky do nothing to diminish the findings of this Court. It was clearly less than forthright, in fact, almost perfidious, for DOE to argue vehemently for its June 2, 1977 Order on the very day it was issuing another which drastically changes the former. Both decisions of December 2, 1977 and December 20, 1977 were issued subsequent to the filing of this suit and appear to enlarge Husky's entitlement purchase obligations beyond that required under a negative 1.47 percent profit margin. The first of these proposed orders, that of December 2, 1977, merely reinstates the years 1968–1970 in the historical base period and thereby adjusts the historical profit margin to a negative 2.29 percent. This holding, which obviously increases the plaintiff's entitlement expenditures, contradicts FEA's own earlier decision which found that inclusions of these years in Husky's historical base period would "seriously affect the firm's competitive position." 2 FEA, *supra*, at 83463. The second proposed order, that of December 20, 1977, is somewhat more complex. The defendant therein proposes to depart from the historical profit margin portion of the *Delta* test and use the alternative return on invested capital standard. Entitlement relief is nevertheless denied because Husky's return

on invested capital (positive 1.24 percent) exceeds the firm's fiscal 1977 return on invested capital. The DOE therefore asserts now, for the first time, that this order deprives the Court of any further jurisdiction, because since the return on invested capital test must be applied, any decision regarding the historical profit margin is not now ripe for review.

This Court does not, however, agree that the December 20, 1977 proposed order, which was issued the same day that the parties made their final oral arguments on the cross-motions for summary judgment, can now suspend these proceedings. That kind of administrative sleight of hand should not be allowed to obscure the real issue. The central question presented in this case concerns the competitive viability of Husky's refining and marketing operation. The proposed December 20, 1977 decision, if anything, tends to increase the entitlements purchase obligations of the plaintiff and does not minimize but rather enhances the problem. The proposed orders of December 2, 1977 and December 20, 1977 serve only to emphasize the agency's thrashings in its effort to make Husky pay for its opposition. They highlight the arbitrary and capricious position of DOE.

In view of all of the evidence, the defendant's June 2, 1977 decision must be set aside. The validity of an administrative order must be judged in light of the reasons supporting that order. *Federal Power Commission v. Texaco,* 417 U.S. 380, 397, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974). The agency is bound by its own rules. *Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). Stripped of the defendant's "illustrative" speculation as to Husky's accounting methods and its improper consideration of the plaintiff's production profits, the June 2, 1977 order is reduced to conclusory remarks. It is evident that the defendants have adhered to an inflexible application of the *Delta* criteria based on a suspicion that at least a part of Husky's operation or a subsidiary compa-

ny of the plaintiff is remaining profitable.[2] The record further demonstrates that contrary to the intent of Congress, the competitive viability of Husky's refining and marketing division is clearly threatened by the impact of the DOE's order and that the plaintiff will incur severe hardship and be subject to gross inequity by the application of a negative 1.47 percent historical profit margin when no other small refiner in the Nation has been so treated.

Defendant's counsel in the heat of argument broadly hinted that the Temporary Emergency Court of Appeals (TECA) would eventually find for DOE. We are not unaware that 84 percent of the cases decided by TECA (as shown by Tenth Circuit LEXIS information) have held for the government. But that does not give DOE a bureaucratic license to ignore the mandate of Congress, the department's own rules and regulations, and the evidence of this case. As TECA stated in their recent decision of *Delta Refining Co. v. FEA*, 559 F.2d 1190, 1199 (1977):

> . . . but we deem it of paramount importance that the agency adhere to its own announced rules, that they be applied uniformly, and that the agency be even-handed in its treatment of refiners in the Entitlement's Program.

The even-handed approach, sought by TECA certainly does not, as the defendants contend, encompass the DOE's wooden and harsh application of the *Delta* criteria to the circumstances presented here. We cannot believe that DOE's bureaucracy was authorized by Congress to inflict a continuing dollar loss on Husky in the form of a mandated negative profit margin that requires it to wipe out a modest 2.6 million dollar profit on its 1977 refining operations by a 6.6 million dollar entitlement purchase so as to erase a small positive profit margin in favor of a 1.47 percent negative margin.

That is contrary to the American way, particularly when Husky's historic profit margin occurred because of the unusual circumstances of buying and attempting to revitalize 3 old refineries, which now operate with a slight profit, and give jobs to hundreds of men. Those men's jobs would vanish should Husky's refinery and marketing operations be forced to a collapse by such losses. Yet, what sound businessman would not opt to run a profitable crude operation, if such indeed be the case, and minimize future mandated losses from the refining and marketing operation by closing it down? I cannot believe that Congress intended that result. America did not grow strong on mandated losses. Nor can I believe that our fundamental, basic rules of fairness should force Husky to bear the burden of losing a penny and a half on each sales dollar because of a ruling imposed by the same agency that permits the other small refineries, its competitors, to operate at a historic profit, indeed a 10.9 percent return in Wickett Refining Co., *supra*. To refuse Husky exception relief in this case was discriminatory, and inequitable. DOE says it did it to apply *Delta* consistently to the industry, but overlooked its other rulings and the mandate of Congress; its consistency to *Delta* is indeed its hobgoblin.

■ It is the opinion of this Court that the defendant's imposition of a negative 1.47 percent historical profit margin was arbitrary and capricious in nature, and that there is no substantial evidence and no rational basis to support that determination. It is an abuse of the discretion of the agency not to grant exception relief in this case on grounds of serious hardship and gross inequity. The defendants are therefore required to reopen Husky's request for exception relief and to permit such relief as is necessary to enable the plaintiff to maintain the competitive viability of its refining

---

**2.** THE COURT: Let me ask you this: What would be wrong with adjusting it (profit margin) so it is at a break even situation and not a mandated loss?

MS. CRISMAN: Because we won't do that for other refiners. We are not mandating that they lose money, that is a gross misconception

of the program. The mandate is that they pay into the program, they may make as much as they want beyond that. That is the point of the article, (*The Wall Street Journal* article) although the Court may disregard it. Certainly Husky has never contended that it is not making money in the production area.

and marketing operations. This level of relief shall be reflected in the DOE's entitlement notices. The defendants are restrained from requiring entitlement purchases pending such further determination, and shall also permit the plaintiff to sell sufficient entitlements to recover and recoup the entitlement expenditures made by Husky in December 1977, and thereafter, pursuant to the DOE's requirements. The proposed decisions of December 2, 1977 and December 20, 1977 are obvious nullities, having been made without jurisdiction after this appeal had vested jurisdiction in this Court. The parties are required to disregard them. Accordingly, the plaintiff's motion for summary judgment is granted and the defendant's motion for summary judgment is denied.

