ATLANTIC RICHFIELD COMPANY, et al., Plaintiffs-Appellants,

v.

UNITED STATES DEPARTMENT OF ENERGY

and

Archer-Daniels-Midland Co., et al., Defendants-Appellees.

No. 3–25.

Temporary Emergency Court of Appeals.

Argued Feb. 24, 1981.

Decided July 7, 1981.

Daniel Joseph, Akin, Gump, Hauer & Feld, Washington, D. C., with whom Warren E. Connelly and Harry R. Silver, Washington, D. C., Richard C. Morse, Atlantic Richfield Company, Los Angeles, Cal., James P. Murphy, Marathon Oil Company, Findlay, Ohio, William C. Streets, Mobil Oil Corporation, Fairfax, Va., and Elizabeth P. Smith, Texaco Inc., White Plains, N. Y., were on the brief for plaintiffs-appellants.

Michael T. Scott, Dept. of Justice, Washington, D. C., with whom Thomas S. Martin, Acting Asst. Atty. Gen., C. Max Vassanelli, Paul G. Wallach, Deputy Gen. Counsel, and O. Ann Horn, Dept. of Energy, Washington, D. C., and Jay F. Lapin, Arnold M. Lerman, C. Loring Jetton, Jr., Helen Torelli and Bruce M. Berman, Wilmer, Cutler & Pickering, Washington, D. C., Attys., for Hempstead Resources Recovery Corporation and Refuse Energy Systems Company.

Philip W. Buchen, Stanley Smilack, G. Ridgley Loux and Joseph H. Gale, Dewey, Ballantine Bushby, Palmer & Wood, Washington, D. C., for Archer-Daniels-Midland Company and Arizona Chemical Company.

Samuel Efron, Lewis E. Leibowitz, and Joseph E. Sandler, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., for Hempstead Resources Recovery Corporation.

Albert J. Slap and Frank M. Thomas, Jr., Deputy City Sols., Philadelphia, Pa., for the City of Philadelphia, Pennsylvania.

Lee C. White, John McE. Atkisson, and Gordon M. Thomas, White, Fine & Verville, Washington, D. C., for City of Ames, Iowa Bergen County Utilities Authority, Metropolitan Sanitary District of Greater Chicago, County Sanitation Districts of Los Angeles County, Milwaukee Metropolitan Sewerage District, Department of Environmental Protection of the City of New York, Department of Sanitation of the City of New York, County Sanitation Districts of Orange County, Municipality of Metropolitan Seattle.

Herbert C. Goldstein, City Sol., Harrisburg, Pa., for the City of Harrisburg, Pennsylvania.

Edward W. Hummers, Jr. and Marvin Rosenberg, Fletcher, Heald & Hildredth, Washington, D. C., for Midwest Solvents Company, Inc., were on the brief for the defendants-appellees.

Before CHRISTENSEN, BECKER and LACEY, Judges.

LACEY, Judge.

At issue is the validity of regulations promulgated by the Department of Energy (DOE), by which price-controlled, domestic crude oil (old oil) entitlements are allocated to producers of certain petroleum substitutes. Appellants, plaintiffs below, are four major oil companies that have challenged these regulations. Defendant-appellees are DOE and sixteen intervening public and private users and producers of petroleum substitutes.

On cross-motions for summary judgment, the district court held, first, that regulations allocating domestic crude oil entitlements for use of petroleum substitutes are within DOE's statutory authority to allocate old oil under the Emergency Petroleum

Allocation Act of 1973 (EPAA), 15 U.S.C. §§ 751–760h (1976), and, second, that the plaintiffs-appellants' attacks on the procedural validity of the regulations are without merit. App. 554. The summary judgment motions by DOE and the intervenors were granted; plaintiffs-appellants' motion was denied.

## I

The EPAA directs the President to

promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in amounts specified in (or determined in a manner prescribed by) and at prices specified in (or determined in a manner prescribed by) such regulation.

15 U.S.C. § 753(a) (1976). The statute was passed by Congress "to deal with the present or threatened severe economic hardships caused by shortages of imported and domestically produced crude oil, all of which constituted a 'national energy crisis' and a threat to the public health, safety, and welfare." *Pasco, Inc. v. FEA*, 525 F.2d 1391, 1394 (Em.App.1975). Congress further directed that the power to allocate and to control the price of oil be "exercised for the purpose of minimizing the adverse impacts of such shortages or dislocations on the American people and the domestic economy," 15 U.S.C. § 751(b) (1976), and to further certain generally stated objectives. These objectives included

(A) protection of public health . . . safety and welfare . . . and the national defense;

(B) maintenance of all public services (including facilities and services provided by municipally, cooperatively, or investor owned utilities or by any State or local government or authority . . .);

\*　\*　\*　\*　\*　\*

(D) preservation of an economically sound and competitive petroleum industry; . . .

\*　\*　\*　\*　\*　\*

(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry . . .;

\*　\*　\*　\*　\*　\*

(H) economic efficiency; and

(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

*Id.* § 753(b)(1).

Pursuant to this mandate, the Federal Energy Office (FEO) established price controls on certain kinds of domestic crude oil,[1] setting up a "two-tier" price system for domestic crude oil. Imported crude oil and "new" domestic crude oil, defined as oil from properties which were not producing in 1972 and increased production amounts from pre-1973 properties, were permitted to sell at free-market world prices. Old oil, on the other hand, was not. To insure that the benefits of access to this cheaper price-controlled old oil would be shared equitably, the Federal Energy Administration (FEA) adopted the entitlements program, by which it allocated old oil, without requiring its physical transfer, through the exchange of entitlements among refiners and other firms. 10 C.F.R. § 211.67 (1980).

Under the program, each refiner and other participants in the program are issued a number of entitlements representing their share of the available domestic, price-controlled old oil. Refiners having access to more than their share of old oil must purchase entitlements beyond their initial allocation from other participants in the program. By buying entitlements, refiners with access to more than their share of old oil surrender a portion of the economic ad-

---

1. The President's power under the EPAA was successively delegated to the FEO, Federal Energy Administration (FEA), and DOE. Exec. Order No. 11748, 38 Fed.Reg. 33575 (Dec. 6, 1973); Exec.Order No. 11790, 39 Fed.Reg. 23185 (June 25, 1974), *reprinted in* 15 U.S.C. § 761 note (1976); Exec.Order No. 12038, 43 Fed.Reg. 4957 (Feb. 7, 1978), *reprinted in* 42 U.S.C. § 7151 (Supp. III 1979).

vantage conferred by that access. The broad effect of the entitlements program was to confer upon consumers the benefits of reduced prices with a minimum of economic dislocation.[2]

However, the price and allocation system created adverse side effects. By artificially depressing the price of petroleum below world market levels, the program actually encouraged use of petroleum. And, since products made entirely from imported oil were priced as if they were made in part from cheaper price-controlled oil, the program encouraged importation of foreign oil and correspondingly discouraged substitution of otherwise competitive domestic fuels. Thus, the program fostered, rather than decreased, the Nation's dependence on imported oil. DOE, and FEA before it, viewed this economic distortion—created by its system of allocation and price controls— as contrary to the purpose of Congress in enacting the EPAA; to alleviate, to the maximum extent possible, American dependence on high-priced foreign crude oil. *See* 42 Fed.Reg. 38599 (July 29, 1977); 44 Fed.Reg. 63515 (Nov. 5, 1979).

In the past, the agency has adjusted the entitlements program to reduce or eliminate economic incentives encouraging the use of foreign oil. Thus it has established special entitlements treatment for the use of California crude oil, *see* 10 C.F.R. § 211.-67(a)(4) (1980); 42 Fed.Reg. 62897 (Dec. 14, 1977); 43 Fed.Reg. 26540 (June 20, 1978), and crude oil from the Alaskan North Slope, *see* 10 C.F.R. § 211.67(b)(2) (1980); 42 Fed.Reg. 41565 (Aug. 17, 1977) *as amended* 45 Fed.Reg. 46752 (July 10, 1980), to assure that refiners would have incentives to use these crudes instead of foreign oil. In 1975 FEA began to allocate entitlements to domestic refiners for processing "synthetic" oil derived from Canadian tar sands on the same basis as foreign crude oil. The agency made this adjustment without objection from the refining industry, even though such "synthetic" oil was itself not subject to

allocation or price control by the agency. 10 C.F.R. §§ 211.67(a)(3) (1980); 40 Fed. Reg. 39847, 39848 (Aug. 29, 1975).

The regulations here challenged were promulgated on October 31 and November 12, 1979, 44 Fed.Reg. 63515 (Nov. 5, 1979); 44 Fed.Reg. 66183 (Nov. 19, 1979), pursuant to rulemaking proceedings commenced in May of that year. 44 Fed.Reg. 32225 (June 5, 1979). They provide for allocation of entitlements to users and producers of a variety of gaseous, liquid, and solid petroleum substitutes on the same basis as foreign crude oil. Specifically, the challenged regulations provide for allocation of entitlements for the use of oil shale crude oil, ethyl alcohol (when mixed with gasoline to make gasohol), municipal solid wastes used as boiler fuel, and methane derived from municipal sewage or landfills. In addition, the regulations provide a framework for DOE to decide, on a case-by-case basis, whether to allocate entitlements for the use of non-municipal solid wastes and liquid fuels derived from biomass, coal, and tar sands.

The challenged 1979 regulations, still effective, 10 C.F.R. §§ 211.62, 211.67(a)(5) (1980), purportedly supersede rules promulgated in May 1978, which were the result of a rulemaking proceeding commenced in July 1977. *See* 43 Fed.Reg. 21429 (May 18, 1978). In the July notice of proposed rulemaking, FEA proposed to allocate entitlements to refiners for the use of a synthetic liquid fuel oil shale crude oil, and asked interested persons to submit "comments as to whether any other domestically produced synthetic liquid fuels should be made eligible for inclusion in the entitlements program for the same reasons." 42 Fed.Reg. 38599, 38600 (July 29, 1977). All comments favored the proposed rule; and all comments addressing the issue, including the comment from appellant Atlantic Richfield Company, favored inclusion of other synthetic fuels in the program. App. 156–235.

**2.** The value of an entitlement is currently equal to the difference between the weighted average cost of old oil and that of uncontrolled crude oil purchased by all refiners. Thus, the entitlements program equalizes the crude oil costs of all refiners by making refiners with greater than average access to old oil pay money to refiners with less than average access to old oil.

In the May 1978 rule that followed the July 1977 notice, DOE provided that entitlements would be allocated to refiners using shale oil as a feedstock or boiler fuel in a refinery on the same basis as imported crude oil. Additionally, the agency announced that it would decide later on a case-by-case basis whether the use of shale oil outside a refinery, and other synthetic liquid fuels made from biomass coal, solid waste materials, and tar sands would also earn allocations of entitlements. It is on this latter portion of the May 1978 rule that appellants base their procedural attack on the October and November 1979 regulations. They charge that the portion of the rule stating that DOE will later decide on a case-by-case basis whether synthetic liquid fuels other than shale oil are eligible for entitlements "grossly deviated" from the July 1977 notice of proposed rulemaking, in violation of the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.* (1976), the Federal Energy Administration Act of 1974 (FEAA), 15 U.S.C. §§ 761 *et seq.* (1976), and the Department of Energy Organization Act (DOEOA), 42 U.S.C. §§ 7101 *et seq.* (Supp. III 1979), and that this defect, among others, infects all subsequent regulations governing entitlement allocation to synthetic fuels. As we have noted, however, in October and November 1979, DOE adopted the current regulations, which purportedly supersede the case-by-case portion of the 1978 rule; and DOE currently allocates all entitlements for the use of petroleum substitutes under the 1979 rules.

In granting appellees' motions, the district court upheld the procedural validity of the regulations, and, on the merits, noted that, although the EPAA does not expressly permit DOE to grant entitlements benefits to producers of synthetic fuels, such benefits are *"impliedly* authorized by the Act." App. 569 (emphasis in original). The court held that the regulations merely extend the economic benefits of price-controlled old oil to producers of synthetic fuels and that, indeed, the EPAA mandate that DOE "minimize economic distortion" not only permits but actually may require that DOE allocate the economic benefits of old oil in such a fashion. *Id.* at 569–70. This appeal followed.

## II

Appellants argue that the EPAA was enacted to deal with the shortage of oil by allocation and price controls; it "was not intended to provide a comprehensive solution to all energy problems." Brief of Appellants at 10. By granting entitlements to producers of synthetic fuels, they contend, DOE is "forc[ing] a private company to subsidize the activities of other entities without express authorization." *Id.* at 9. Thus, "unless the EPAA authorizes the subsidization of the production of synthetic fuels, the regulations granting entitlements subsidies to producers of synthetic fuels are invalid." *Id.*

To support their argument, appellants point to the following language from the conference report on the bill that was to become the EPAA:

[T]his bill focuses on the short term objectives of seeing to it that during times of shortages our priority needs are met and that whatever limited supplies we have are equitably distributed throughout the nation to meet the regional needs and preserve competition in the marketplace.

Conf.Rep.No.93–628, 93d Cong., 1st Sess., *reprinted in* [1973] U.S.Code Cong. & Ad. News 2688, 2690–91. Appellants also suggest that FEA initially interpreted the EPAA as "not granting authority to deal with synthetic fuels." Brief of Appellants at 10. FEA documents are quoted stating, "[T]he FEA has concluded that the Congress did not intend these [crude oil substitutes] to be regulated under the EPAA," 41 Fed.Reg. 25886 (June 23, 1976), *quoted in* Brief of Appellants at 10, and

the FEA's authority and mandate to preserve and foster competition in the refining industry and to encourage new refining capacity is limited to the context of a price and allocation program, and does not allow the agency to go outside that context to create a subsidization program for new refiners no matter how laudable the purpose.

Letter to Charles Wallace from Frank G. Zarb, Administrator of FEA (May 21, 1976) (rejecting bid for entitlements by company building new refinery).

Additionally, appellants argue that recent legislation providing for encouragement of synthetic fuel production—e. g., the Crude Oil Windfall Profit Tax Act of 1980, Pub.L. No.96–223, §§ 231, 232, 94 Stat. 229·(1980) (providing tax credit for domestic production of energy from alternative sources, such as oil from shale, oil from tar sands, natural gas from geopressured brine, coal seams or Devonian shale, liquid gaseous or solid synthetic fuel from coal liquefaction or gasification facilities, gas from biomass, steam from solid agricultural by-products and qualifying processed solid wood fuels), and the Energy Security Act, Pub.L.No.96–294, 94 Stat. 611 (1980) (enabling Synthetic Fuels Corporation to offer loans, etc., to subsidize private synthetic fuels industries) —suggests that the EPAA was not intended to do so.

Finally, appellants cite the recent decision by the Court of Appeals for the District of Columbia Circuit in *Office of Consumers' Counsel v. FERC*, 655 F.2d 1132 (D.C.Cir., 1980), for the simple proposition that statutory authority cannot be implied to further a goal not authorized by Congress. Brief of Appellants at 15. This, though, simply begs the question—is DOE authorized under the EPAA to extend the entitlements program to producers of synthetic fuels?[3]

DOE's position is that it is authorized under the EPAA to allocate price-controlled old oil, 15 U.S.C. § 753(a) (1976), and to enact regulations furthering the purposes of the Act, *see id.* § 753(b)(1). Thus, the agency argues, "[i]n allocating crude oil entitlements for the use of petroleum substitutes, DOE has simply exercised its authority to allocate price-controlled crude oil. . . . The regulations at issue here do not allocate, impose price controls on, or otherwise exercise regulatory authority over petroleum substitutes: the product allocated is price-controlled crude oil, a product expressly subject to DOE's regulatory power." Brief of Appellees at 7–8.

Appellees argue that the EPAA mandates that DOE promulgate and adjust regulations to achieve certain broadly stated objectives, among them "minimization of economic distortions" and "unnecessary interference with market mechanisms," 15 U.S.C. § 753(b)(1)(I) (1976), and—as appellants concede—"to alleviate, to the maximum extent possible, American dependence on extremely high priced imported crude oil." Complaint ¶ 9, *reprinted in* App. at 6. After Congress set up the two-tier pricing system for domestic and imported crude oil during the Arab oil embargo, DOE found that certain dislocations were being caused by the two-tier system itself: Some refiners and some sectors of the economy had unequal access to price-controlled old oil; others were more dependent on higher-priced imported oil. The original entitlements program was promulgated to correct this situation. By spreading the advantage of access to old oil among all refiners, the program allowed virtually all oil sold in the United States to be priced as though it had been produced in part from old oil.

The original entitlements regulations, however, produced dislocations of their own: Because the program had the effect

3. *Office of Consumers' Counsel* is actually distinguishable, as appellees point out. There, the Federal Energy Regulatory Commission (FERC) issued an order that would have resulted in surcharges to current natural gas customers to finance the construction of a synthetic gas plan which would not produce synthetic gas for consumption by those consumers for several years, if at all. The court of appeals held that, while such requirements could be imposed by FERC after it had acquired jurisdiction over the gas produced by the plant when it became commingled with natural gas, limita-tions on FERC's authority under the Natural Gas Act, 15 U.S.C. §§ 717 *et seq.* (1966), prevented it from asserting such authority in advance of such a "jurisdictional act," *Office of Consumers' Counsel v. FERC*, (D.C.Cir., 1980), *attached as Addendum B to* Brief of Appellant at 25a–27a, 30a & n.32: The Natural Gas Act gives FERC regulatory authority over natural gas, 15 U.S.C. § 717(b) (1976), which is defined as "either natural gas unmixed, or any mixture of naturla [*sic*] and artificial gas," *id.* § 717a(5); pure, unmixed synthetic gas was at issue in the case.

of "equalizing" the cost of imported oil below world market price levels, it was actually encouraging importation and use of foreign oil while at the same time putting producers of synthetic alternatives to crude oil at a disadvantage. DOE describes the regulations at issue here—assigning entitlements to producers of synfuels—as "an ingenious solution," Brief of Appellees at 8, designed to "minimize the disincentives" to the use of synfuels that were attributable to the original entitlements regulations.

Essentially, appellants' major complaint is that allocation of entitlements for the use of petroleum substitutes "require[s] private companies to subsidize producers of synthetic fuels." Brief of Appellants at 7. Appellees, of course, deny the entitlements program constitutes subsidization, although statements such as, "[t]hese regulations . . . do not and were not intended to promote affirmatively the development of the synthetic fuel industry," Brief of Appellees at 15, have a hollow ring. Indeed, in the same breath, appellees admit that the regulations "promote the use of petroleum substitutes only in the limited respect of removing the competitive disadvantage suffered by such products (in relation to cost-equalized petroleum) as a direct result of the pre-existing regulatory program." *Id.*

█ It seems clear that, to some extent, the regulations do provide for subsidization of synfuels. But, as the district court found, "This characterization simply ignores the fact that even though many regulatory programs impose economic burdens, they are not invalid merely because there are some who are dissatisfied with the placement of the burdens or the flow of the 'subsidies.'" App. at 575. Moreover, the subsidy aspect of the entitlements program has been disposed of by the Temporary Emergency Court of Appeals on prior occasions, and this court has concluded that allocation of the economic advantage of old oil does not constitute an impermissible subsidy. *See Pasco v. FEA,* 525 F.2d 1391, 1399–1402 (Em.App.1975) (challenge to original program); *Condor Operating Co. v. Sawhill,* 514 F.2d 351, 361–62 (Em.App.), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975).[4]

Thus, to the extent the regulations force a subsidy, it is a permissible one, consistent with the purposes of the EPAA. And any regulation of the synfuel industry is minimal, plainly within the EPAA's mandate to "minimiz[e] economic distortions." Indeed, it is worth noting that, while appellants insist that Congress in enacting the Energy Security Act, Pub.L.No.96–294, 94 Stat. 611 (1980), and the Crude Oil Windfall Profit Tax Act of 1980, Pub.L.No.96–223, 94 Stat. 229 (1980), must have intended to limit the field of synfuel regulations to mechanisms contained in those two pieces of legislation, it is clear that (1) Congress was aware of the existence of the DOE regulations challenged here, *see* Report of Senate Comm. on Finance, Crude Oil Windfall Profit Tax Act of 1980, S.Rep.No.394, 96th Cong., 1st Sess. 90–91 (1979), U.S.Code Cong. & Admin.

---

4. Indeed, the district court stated:

> The "burdens" of the Entitlements Program are no more than lawful incidents of a system authorized by the EPAA. Moreover, entitlements payments cannot really be considered donations or subsidies because refiners do not have any legal right to exclusive enjoyment, at the expense of producers and users of petroleum substitutes, to the economic benefits of crude oil price controls. Similar arguments were rejected in *Cities Service v. FEA,* 529 F.2d at 1025, 1029 which held that the Entitlements Program was neither a "taking" or a "tax."

App. at 576.

The dissent finds the citation of *Pasco* and *Condor* "confusing." Dissent, Typescript at 4. We do not, however, cite these authorities as support for the proposition that DOE has authority to regulate the synfuel industry, as the dissent appears to suggest. Rather, as the dissent concedes, the cases stand for the proposition that "insofar as DOE's entitlements regulations require certain crude oil refiners to subsidize certain other crude oil refiners, the regulations do not establish an impermissible subsidy." *Id.* Implicit in this statement is that DOE's regulations may force certain refiners with disproportionate access to old oil to partially disgorge some of this economic advantage without offending due process. And it is for this proposition that reference is made to *Pasco* and *Condor. See also Cities Service Co. v. FEA,* 529 F.2d 1016, 1025–28 (Em.App.1975), *cert. denied,* 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976).

News 1980, p. 410, and (2) neither piece of legislation purports to limit the entitlements program as presently constituted. As appellees point out, "[i]t would be ironic in the extreme if DOE were held to lack authority to make adjustments in its petroleum regulations that do no more than minimize the adverse effect those regulations have on the very problem Congress directed DOE to resolve." Brief of Appellees at 20.[5]

### III

Appellants charge that the final rule adopted by DOE in May 1978 "grossly deviated" from the notice of proposed rulemaking published by FEA in July 1977, thereby contravening the APA, FEAA, and DOEOA. The July 1977 notice proposed "to amend the domestic crude oil allocation program (the 'entitlements' program) so as to permit refiners to include in their crude oil runs to stills (and thereby earn entitlements for) those volumes of synthetic crude oil processed from oil shale found within the United States that they utilize as a refinery feedstock." 42 Fed.Reg. 38599 (July 29, 1977), *reprinted in* App. at 163. The notice went on to state:

> FEA is informed that processes are currently in the developmental state for recovering synthetic liquid fuels from sources other than oil shale. FEA is not aware that any such other synthetic fuels are currently available in commercial quantities *and for this reason is not including these other synthetic fuels in this proposed rulemaking.* However, in addition to requesting comments on the proposed rule, *FEA also requests comments as to whether any other domestically produced synthetic liquid fuels should be made eligible for inclusion in the entitlements program for the same reasons* as the above proposal with respect to oil shale crude oil.

*Id.* at 38600, *reprinted in* App. at 164 (emphasis added).

On May 18, 1978, DOE adopted a final rule. 43 Fed.Reg. 21429 (May 18, 1978), *reprinted in* App. at 237. In that rule DOE adopted the proposed rule with respect to allowing refiners to earn entitlements benefits by utilizing synthetic fuel derived from oil shale in their refineries. However, the rule went on from there to provide that

> [t]he amendments set forth that the ERA may, on a case-by-case basis, grant entitlements treatment on the same basis as that adopted for shale oil to synthetic liquid fuels made from biomass, coal, solid waste materials or tar sands and used in refineries, *as well as all such synthetic fuels, plus oil shale derivatives, which are used as boiler or engine fuels outside a refinery.* The purpose of these amendments is to remove the inconsistency which currently exists regarding the treatment under the entitlements program of synthetic liquid fuels as compared to the treatment of imported crude oil.

*Id.* (emphasis added).

This final rule, appellants contend, "created an entitlements program completely different from both the existing program and the limited oil shale amendment proposed in the [July 1977 notice of proposed rulemaking]." Brief of Appellants at 17.

In February 1979, DOE issued guidelines regarding inclusion of petroleum substitutes in the entitlements program. 44 Fed. Reg. 6895 (Feb. 5, 1979), *reprinted in* App. at 253. Subsequently, DOE issued an amendment to the entitlements program "to permit the *automatic* inclusion in the crude oil entitlements program of ethyl alcohol derived from domestic biomass when mixed with gasoline for use as fuel . . . ." 44 Fed.Reg. 63515 (Nov. 5, 1979), *reprinted in* App. at 242 (emphasis added). Finally, shortly thereafter, DOE further amended the program

---

5. The FEA documents cited by appellants on pages 10–12 of their brief do not suggest a contrary result. They suggest only that FEA did not believe itself authorized to "regulate" the synfuel industry. Although DOE's present position—that the present entitlements program does not "regulate" the industry at all— again smacks of disingenuousness, any regulation of the industry is minimal and within the EPAA's mandate to "minimiz[e] economic distortions."

to provide for the automatic inclusion in the crude oil entitlements program of solid municipal waste and solid derivatives thereof used as fuel, shale oil used for non-refining purposes, and methane derived from municipal sewage or landfills. The amendments will also permit solid fuels derived from non-municipal solid waste, as well as solid gaseous fuels derived from any solid waste sources, to receive the same treatment as liquid solid-waste derivatives, which are currently eligible on a case-by-case basis for inclusion in the entitlements program.

44 Fed.Reg. 66183 (Nov. 19, 1979), *reprinted in* App. at 248. The preamble to both these amendments began with the statement that "[o]n May 12, 1978, we issued a final rule ...." 44 Fed.Reg. at 63516; *id.* at 66183.

The APA requires publication of notice of proposed rulemaking in the *Federal Register.* The notice must include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3) (1976). The APA further requires interested persons to be given an opportunity to participate in the rulemaking proceeding through submission of "written data, views, or arguments" pertaining to the proposed rule. *Id.* § 553(c).

As to the FEAA and DOEOA, the DOEOA became effective October 1, 1977, 42 Fed.Reg. 46267 (Sept. 15, 1977); section 709(a) of that act eliminates the publication requirement of the FEAA to which appellants refer, 15 U.S.C. § 766(i)(1)(B) (1976), and thus controls the May 1978 rulemaking. *See* DOEOA, Pub.L.No.95–91, § 709(a)(2)(B)–(C), 91 Stat. 608 (1977). The rulemaking requirements of DOEOA are more stringent than those contained in the APA, requiring—as did the FEAA, *see* 15 U.S.C. § 766(i)(1)(B)–(C) (1976)—that notice be given "by publication of such proposed rule, regulation, or order in the Federal Register." 42 U.S.C. § 7191(b)(1) (Supp. III

1979), and that an opportunity for oral presentation of views, data, and argument be afforded to interested persons if the proposed rule, regulation, or order is likely to have a substantial impact on the nation's economy or large numbers of individuals or businesses, 42 U.S.C. § 7191(c)(1) (Supp. III 1979). In addition, the Act requires that

> [p]ublication of such proposed rule, regulation, or order in the Federal Register ... shall be accompanied by a statement of the research, analysis, and other available information in support of, the need for, and the probable effect of, any such proposed rule, regulation or order.

42 U.S.C. § 7191(b)(1) (Supp. III 1979).

Appellants argue that none of these requirements were met in the May 1978 rule, which had "fatal defects," or in the subsequent promulgations, where "the agency flatly refused to take public comment or to examine the factual and policy assumptions that it had earlier made ...." Brief of Appellants at 23. Appellees argue that all requirements of the three acts were met.

■ We find APA requirements were substantially met by the rulemaking procedure followed with respect to the May 1978 rule.[6] It is equally clear that the DOEOA was at least technically violated by the procedure followed by FEA and DOE in promulgating that rule, if for no other reason than that the rule was not published in the *Federal Register* prior to its adoption. Although appellees do make some effort to argue that the portion of the rule announcing a case-by-case approach to synfuel entitlements was not a legislative rule with a palpable impact on private parties—and therefore exempt from the APA and DOEOA's notice requirement as a "general statement of policy," 5 U.S.C. § 553(b)(A) (1976) (incorporated by reference in DOEOA)—we do not find the argument

---

6. As this court recently stated in *McCulloch Gas Processing Corp. v. DOE*, 650 F.2d 1216 (Em.App.1981), "[Under the APA, an] agency need not publish in advance every precise proposal it may ultimately promulgate as a rule.... Notice under § 553(b) is sufficient if it affords interested parties a reasonable and meaningful opportunity to participate in the rulemaking process." *Id.* at 1221 (citations omitted).

convincing. However, it is not necessary to resolve whether the May 1978 rule was properly promulgated, because the October and November 1979 regulations supersede the challenged portion of the May 1978 rule, and these subsequent amendments were properly promulgated.[7]

## IV

Accordingly, we affirm the decision of the district court.

CHRISTENSEN, Judge, concurring and dissenting.

I concur in the excellent opinion of Judge Lacey stating the case and sustaining the rulemaking procedures on this appeal. I feel constrained, however, to dissent from Part II, which sustains the district court's holding that regulations allocating domestic crude oil entitlements for use of petroleum substitutes (synthetic fuels) are within DOE's statutory authority to allocate old oil under the EPAA, 15 U.S.C. §§ 751–760h (1976).

The EPAA did not vest express authority in the Department of Energy or its predecessors to regulate synthetic fuels or crude oil substitutes as part of the petroleum allocation and pricing program. Indeed, defendants concede that DOE is without such regulatory authority. Nor can it be reasonably contended in view of the express provision of the Act, its legislative history and the prior decisions of this court, that any implied authority was granted to DOE or its predecessors to indirectly regulate the synfuels industry any more than any other industry involving other non-petroleum products.

The doctrine of implied powers rests upon unexpressed authority necessary or convenient for the exercise of authority expressly granted. As we said in *Marathon Oil Co. v. FEA*, 547 F.2d 1140, 1145 (Em.App.1976), the agency has those powers "necessarily implied for the exercise of the authority expressly granted over the allocation and pricing of petroleum products or oil." In *Mobil Oil Corp. v. Federal Energy Administration*, 566 F.2d 87, 93 (Em.App.1977), this court declared that Congress intended to confer authority that was "imperative for the achievement of an agency's ultimate purpose." In *NAACP v. FPC*, 425 U.S. 662, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976), the Supreme Court held that the FPC had no authority to prohibit its regulatees from engaging in discriminatory practices except insofar as these affected the establishment of rates. The Court noted that the "public interest" language in the empowering statute was too vague a basis upon which to imply such broader authority. The general "words take meaning from the purposes of the regulatory legislation," which were in that case to regulate electricity and natural gas prices. 425 U.S. at 669–70, 96 S.Ct. at 1811–1812. *See also FCC v. Midwest Video Corp.*, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979). *Cf. United States v. Midwest Video Corp.*, 406 U.S. 649, 664, 92 S.Ct. 1860, 1869, 32 L.Ed.2d 390 (1972), where it was stated in upholding certain agency authority that "avoidance of adverse effects is itself the furtherance of statutory policies," that statement being made, however, in connection with recogni-

---

7. In this regard, although both 1979 regulations—and their preceding notice of proposed rulemaking issued May 27, 1979—refer to the May 1978 "final rule," which appellants argue appeared to foreclose the question of the propriety of synfuel entitlements to other than shale oil producers, the May 1979 notice plainly indicates that DOE has not conclusively resolved whether, as a matter of policy, any petroleum substitute other than shale oil used in refineries should be included in the entitlements program, and invites comment on this policy issue as well as on all other aspects of the proposed rules. *See* 44 Fed.Reg. 32227 (June 5, 1979). Moreover, the notice expressly states that DOE has not finally resolved whether it has statutory authority under the EPAA to include any additional petroleum substitutes in the entitlements program, and the agency explicitly solicits comment on that issue as well. *Id.* at 32226, 32228. Further, the May 1979 notice includes precisely the proposed regulations ultimately adopted by the agency in October and November 1979, and these regulations clearly supersede the challenged case-by-case portion of the May 1978 final rule.

tion of jurisdiction on the part of the Commission over CATV transmissions and with reference to the exercise of that authority, *id.* at 663–64, 92 S.Ct. at 1868–1869, and not concerning an industry not the object of regulatory powers on the part of the agency, as here. Here, the purported justification for allocations of entitlements to members of the synfuels industry does not relate to any authority to regulate that industry but instead rests upon the claimed lessening of the impact of the regulations upon an industry over which it has not been granted regulatory authority. I find the position of DOE as quoted in the majority opinion internally inconsistent, at times a mere play on words, and essentially unsatisfactory (and the majority opinion is somewhat unclear as to what part of this position it has embraced):

> In allocating crude oil entitlements for the use of petroleum substitutes, DOE has simply exercised its authority to allocate price-controlled crude oil.... The regulations at issue here do not allocate, impose price controls on, or otherwise exercise regulatory authority over petroleum substitutes: the product allocated is price-controlled crude oil, a product expressly subject to DOE's regulatory power.

Moreover, there is here an implicit concession tending to compromise the validity of the claimed authority. If DOE has no regulatory authority over petroleum substitutes, can it accomplish such regulation under the guise of regulating crude oil? If the device for conferring benefits created as part of its authority to regulate crude oil is used to subsidize an industry over which it has no regulatory power and as to which the "entitlements" are entirely out of context and cannot be used except as a cash equivalent, would such subsidy be any less justifiable if cash were directly awarded by DOE? Could such an extension of the entitlements program to synthetic fuels properly render the extension a part of a legitimate system for the regulation of crude oil?

It seems confusing for the majority opinion to cite *Pasco, Inc. v. Federal Energy Administration*, 525 F.2d 1391 (Em.App. 1975), and *Condor Operating Company v. Sawhill*, 514 F.2d 351 (Em.App.), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975). Those cases held that as part of the allocation authority expressly granted by the EPAA the allocation of economic advantage of old oil through the entitlements program within the petroleum industry does not constitute an impermissible subsidy. This proposition does not support this court's conclusion that to the extent "the regulations force a subsidy, it is a permissible one, consistent with the purposes of the EPAA." Those earlier cases prove only that insofar as DOE's entitlements regulations require certain crude oil refiners to subsidize certain other crude oil refiners, the regulations do not establish an impermissible subsidy. It does not necessarily follow that other industries not covered by the EPAA can be added to the same program and as to them also the subsidy becomes permissible.

The open-ended nature of the purported authority in view of the reasons recited in its support is indeed sweeping. If such subsidies can be granted by DOE to industries over which it has been granted no regulatory power merely because this would help achieve some of the broadly stated objectives of the EPAA (e. g., the "minimization of economic distortions" and the avoidance of "unnecessary interference with market mechanisms"), any other industry, whether or not directly involving substitutes for petroleum, could be subsidized through crude oil "entitlements" for they too could be shown to be the victims of "economic distortions" or "interference with market mechanisms" occasioned by DOE's allocation program.

The broad statements of objectives set out in the EPAA, 15 U.S.C. § 753(b)(1)(I) (1976), in my opinion, were intended to guide the agency in the exercise of powers expressly or impliedly granted to it by the Act, not to grant sweeping additional au-

thority of the kind approved by the majority opinion.

That there is no overpowering public interest commending such an expansive interpretation of DOE's powers is indicated by its recent proposal to virtually abandon the "standards and criteria governing the qualification of alternate fuels as petroleum substitutes under the case-by-case determination" because, among other reasons, they "have not best furthered the purposes of the EPAA." Notice of Proposed Rulemaking and Public Hearing, 46 F.R. 19450, 19451 (Mar. 30, 1981).